UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| JB WHITELOW, JR., | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| EATON, *C.O.*; SGT. DRADA, *C.O.*; | ) | No. 2:22-cv-00189-JMS-MJD |
| SGT. COBB, *C.O.*; SMALL, *C.O.*; | ) | |
| ALLEN, *C.O.*; RUSSELL, *C.O.*; | ) | |
| MARTIN, *C.O.*; ASHLYNN GONTHIER; | ) | |
| THOMAS WELLINGTON; L. WADWHAN; | ) | |
| CHAMBERS, *Sgt.*; PIRTLE, *Sgt.*; TROUPE, *Officer*; | ) | |
| | ) | |
| | ) | |
| *Defendants*. | ) | |

**<u>ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

Plaintiff JB Whitelow, Jr. is an inmate currently incarcerated at Wabash Valley Correctional Facility ("<u>Wabash Valley</u>").  He filed this lawsuit alleging violations of his First Amendment, Eighth Amendment, and Fourteenth Amendment rights.[1]  Defendants have filed a Motion for Summary Judgment, which is ripe for the Court's consideration.  [Filing No. 46.]  For the reasons below, that motion is **GRANTED IN PART**, and the Court **TAKES UNDER ADVISEMENT** Mr. Whitelow's medical deliberate indifference claim subject to additional briefing from Mr. Whitelow.

---

[1] These are the claims which the Court found should proceed after the Court screened Mr. Whitelow's Second Amended Complaint pursuant to 28 U.S.C. § 1915A(a), (c).  [Filing No. 11; Filing No. 14.]

1

# I.

## STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record in the light most favorable to the non-moving party, including giving that party the benefit of conflicting evidence, and draws all reasonable inferences in that party's favor. *Ziccarelli v. Dart*, 35 F.4th 1079, 1083 (7th Cir. 2022); *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572-73 (7th Cir. 2021); *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573-74 (7th Cir. 2017) (cleaned up). "Taking the facts in the light most favorable to the non-moving party does not mean that the facts must come only from the nonmoving party. Sometimes the facts taken in the light most favorable to the non-moving party come from the party moving for summary judgment or from other sources." *Gupta v. Melloh*, 19 F.4th 990, 997 (7th Cir. 2021).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Summary judgment is not a time to be coy: conclusory statements not grounded in specific facts are not enough." *Daugherty v. Page*, 906 F.3d 606, 611 (7th Cir. 2018) (cleaned up). Rather, at the summary judgment stage,

"[t]he parties are required to put their evidentiary cards on the table." *Sommerfield v. City of Chicago*, 863 F.3d 645, 649 (7th Cir. 2017).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

When the evidence in the case involves a video of the relevant events, "[a] twist on the usual standard of review is at play." *Williams v. Brooks*, 809 F.3d 936, 942 (7th Cir. 2016). "When the evidence includes a videotape of the relevant events, the Court should not adopt the nonmoving party's version of the events when that version is blatantly contradicted by the videotape." *Id.* (citing *Scott v. Harris,* 550 U.S. 372, 379-80 (2007)). In other words, the Court "can rely on clear and conclusive videos if 'they firmly settle[ ] a factual issue.'" *Manery v. Lee*, 124 F.4th 1073, 1077 n.5 (7th Cir. 2025) (quoting *Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018)).

## II.
### FACTUAL BACKGROUND

The facts stated below are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. Am. Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005). In other words, because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to Mr. Whitelow, including giving him the benefit of conflicting evidence, and draws all reasonable inferences in that party's favor. *Ziccarelli*, 35 F.4th at 1083; *Khungar*, 985 F.3d at 572-73. This means that where Mr. Whitelow has submitted

admissible evidence[2] regarding his version of events, the Court accepts his version as true for the purposes of summary judgment, ignoring Defendants' conflicting evidence.

### A. May 4 - Mr. Whitelow Arrives at Wabash Valley

In the evening on May 4, 2020, Mr. Whitelow was transferred to the Secured Confinement Unit ("SCU") at Wabash Valley from another facility. [Filing No. 47-1 at 9; Filing No. 47-1 at 17; Filing No. 47-2 at 1.] When Mr. Whitelow arrived, Sgt. Eaton was the supervising sergeant over the SCU unit where Mr. Whitelow was placed. [Filing No. 47-1 at 69; Filing No. 47-2 at 1.] Mr. Whitelow was placed in a housing unit that contained an isolation range that was used as part of the facility's COVID-19 protocols. [Filing No. 47-1 at 68; Filing No. 47-2 at 1.] Mr. Whitelow did not have COVID-19 and was mistakenly placed in the isolation range. [Filing No. 47-1 at 68; Filing No. 47-3 at 1.]

Mr. Whitelow was escorted to his cell by Sgt. Eaton and two additional officers. [Filing No. 47-12 at 00:28-00:42 (manually filed video of Mr. Whitelow's escort to his cell);[3] see Filing No. 50; Filing No. 51.] The officers guided Mr. Whitelow into his cell before exiting and signaling another officer to close the door. [Filing No. 47-12 at 00:28-01:25.] Once the door was securely

---

[2] In his Statement of Facts, Mr. Whitelow often cites to the Court's summary of Mr. Whitelow's allegations from his Second Amended Complaint in the Court's Screening Order at Filing No. 14. [Filing No. 62.] The Court's summation of Mr. Whitelow's allegations in its Screening Order pursuant to 28 U.S.C. § 1915A and Federal Rule of Civil Procedure 12(b)(6) is not admissible evidence that establishes the absence or presence of a genuine dispute on summary judgment. See Fed. R. Civ. P. 56(c).

[3] Defendants submitted and manually filed ten videos as evidence with their Motion for Summary Judgment. [Filing No. 47-12 through Filing No. 47-21; see Filing No. 50 (Notice of Manual Filing); Filing No. 51 (Court's receipt of manual filings).] Mr. Whitelow has access to all ten videos through the litigation liaison at Wabash Valley. [See Filing No. 47-12 through Filing No. 47-21; Filing No. 62 (Mr. Whitelow's Brief/Memorandum in Support of Response to Motion for Summary Judgment, which cites and describes parts of the videos).] Because the videos were manually filed, the Court does not provide links to the docket in citations to the videos.

closed, Mr. Whitelow approached the door, and Sgt. Eaton and the other officers utilized the cuff

port to remove Mr. Whitelow's hand restraints.  [Filing No. 47-12 at 01:25-03:39.]  At times, an

officer's body obstructed the camera's view of the cuff port.  [Filing No. 47-12 at 01:25-03:39.]

After Mr. Whitelow's hand restraints were removed, Mr. Whitelow took a step back inside

his cell and the video shows an obstructed view of an open and clear cuff port.  [Filing No. 47-12

at 03:35-03:36.]  Sgt. Eaton then took a step forward to close the cuff port, and simultaneously,

Mr. Whitelow took a step forward within his cell.  [Filing No. 47-12 at 03:35-03:37.]  Sgt. Eaton

lifted the cuff port closed with one hand and took a half step backward, pausing for about a half-

second before beginning to walk away with one of the other officers.  [Filing No. 47-12 at 03:37-

03:42.][4]  Mr. Whitelow then gently pushed open the cuff port about two seconds later.  [Filing No.

47-12 at 03:41-03:45.]  Sgt. Eaton turned around, gently closed the cuff port and held it shut, while

another officer retrieved a key and locked the cuff port closed.  [Filing No. 47-12 at 03:45-03:52.]

Once the cuff port was securely closed, Mr. Whitelow walked away from his cell door, and Sgt.

---

[4] Mr. Whitelow submits evidence (his affidavit and grievance forms) that during the first closure of the cuff port, Sgt. Eaton closed the cuff port while Mr. Whitelow's hand was in it, trapping and crushing his hand and fingers.  Mr. Whitelow argues that the video evidence creates a genuine issue of material fact regarding whether Sgt. Eaton used excessive force when closing his hand and fingers on the inside of the cuff port because the view of the video camera "was fully obstructed."  [Filing No. 62 at 14.]  The Court disagrees. While the cuff port cannot be seen at all times on the video, it can be seen unobstructed in important moments, and the Court highlights that other portions of the video show Mr. Whitelow taking a step back from the cell door revealing an unobstructed cuff port almost immediately before Sgt. Eaton closed it for the first time, Sgt. Eaton first closing the cuff port with one hand with no quick or jerky movements, and Mr. Whitelow gently pushing the cuff port back open, which clearly contradict Mr. Whitelow's version of the facts and establish that Sgt. Eaton used only de minimis force in closing Mr. Whitelow's cuff port.  *Jones v. Anderson*, 116 F.4th 669, 679 (7th Cir. 2024) (finding that a video irrefutably established an officer's use of de minimis force even though it did not "capture every second of every aspect" of the event at issue because other events depicted on video immediately after discredited the plaintiff's assertions of excessive force).  Based on the video, the Court does not adopt Mr. Whitelow's version of Sgt. Eaton closing the cuff port while Mr. Whitelow's hand was in it.  *Scott*, 550 U.S. at 379-80; *Manery*, 124 F.4th at 1077 n.5.

Eaton and the other officers exited the range. [Filing No. 47-12 at 03:45-04:03.] But before exiting the range, Mr. Whitelow requested medical attention for his hand, and Sgt. Eaton said: "That will teach you not to put your hands on staff!" [Filing No. 63 at 6 (Affidavit of Mr. Whitelow).] "No correctional officer contacted medical for any assistance." [Filing No. 63 at 6.]

**B.  May 5 - Mr. Whitelow Is Moved to Another Cell**

The next day on May 5, 2020, Major Russel, who was not present when Mr. Whitelow arrived, noticed that Mr. Whitelow had mistakenly been placed in the isolation range. [Filing No. 47-3 at 1.] Mr. Whitelow told Major Russell that Sgt. Eaton placed him "on the COVID-19 positive range to provoke misbehavior on [his] part." [Filing No. 63 at 6.] Major Russel contacted Wabash Valley's Count Office, Mr. Whitelow's cell assignment was corrected, and he was moved to a cell with a camera. [Filing No. 47-3 at 1.] Mr. Whitelow also informed Major Russell that his hand had been injured. [Filing No. 47-3 at 2.] Major Russell informed medical staff of Mr. Whitelow's complaint regarding his hand. [Filing No. 47-3 at 2.]

**C.  May 5 - Mr. Whitelow Covers His Camera and Cell Window**

In the evening of May 5, 2020, while in his cell with a camera, Mr. Whitelow continuously covered the camera and his cell windows.[5] [Filing No. 47-13 (a 58:49-minute-long video depicting Mr. Whitelow continuously covering his camera and his door); Filing No. 47-16 (a 1:01:08-hour-long video depicting the same).] Just after 6:30 p.m. on May 5, 2020, Officer Martin approached

---

[5] Mr. Whitelow objects to Defendants' inclusion of this fact in its Statement of Fact to the extent the fact alleges any wrongdoing on behalf of Mr. Whitelow. [Filing No. 62 at 5-6.] He asserts that "any and all disciplinary records, reports, or facts are irrelevant to this case and potentially unfairly prejudicial." [Filing No. 62 at 6.] The Court **OVERRULES** Mr. Whitelow's objection because Mr. Whitelow's actions of covering his camera are clearly depicted in video and the relevance of such actions, as evident in the following events, outweighs any alleged issues. In any event, the Court notes that Mr. Whitelow cites to and proffers arguments regarding parts of his disciplinary record and corresponding reports, which undermines his argument that the Court should not consider them. [*See, e.g.*, Filing No. 62 at 6-8.]

Mr. Whitelow's cell and informed him that he was not permitted to cover his cell's window or camera as he had been doing but that he was allowed to cover the camera to use the toilet. [Filing No. 47-14 at 0:59-5:05; Filing No. 63 at 7.] Correctional staff's ability "to monitor offenders placed in camera cells is an important function for the safety and security of the prison." [Filing No. 47-4 at 3.] Mr. Whitelow "showed [his] hand injuries to Officer Martin and she said [he] would be seen by medical staff soon" and "even said that she would email medical staff and internal affairs to speed things up, but she never emailed medical staff." [Filing No. 63 at 7.] Officer Martin emailed internal affairs, however, and informed them that Mr. Whitelow was "requesting to speak with one of [them]" and that he was "adamant about it." [Filing No. 47-4 at 3; Filing No. 47-4 at 11.]

Mr. Whitelow eventually complied and removed the cover from his cell's camera and window. [Filing No. 47-4 at 2.] Defendant Martin exited the range and wrote Mr. Whitelow "a misbehavior report . . . for covering the camera to use the toilet." [Filing No. 47-14 at 05:01-05:06; Filing No. 63 at 7.]

Shortly thereafter, Mr. Whitelow resumed covering his cell's window and camera. [Filing No. 47-4 at 2; Filing No. 47-14 at 10:03-41:55.] Officer Martin requested the help of Sgt. Eaton due to Mr. Whitelow repeatedly covering his window and camera. [Filing No. 47-4 at 2.] Officer Martin eventually went to Mr. Whitelow's cell to communicate with him to stop covering his cell's camera and window. [Filing No. 47-2 at 2; Filing No. 47-4 at 2; Filing No. 47-15 at 04:55-07:32.] Mr. Whitelow kept his window covering up while communicating with Sgt. Eaton, who ordered Mr. Whitelow to uncover his camera and keep it uncovered. [Filing No. 47-2 at 2; Filing No. 47-15 at 04:55-07:32.] Mr. Whitelow asked for medical attention and Sgt. Eaton "claimed that [Mr. Whitelow's] hand injuries were accidental and not [Sgt. Eaton's] fault." [Filing No. 63 at 7.] Mr.

Whitelow told Sgt. Eaton that he disagreed and that he "would only talk to Sgt. Eaton after [he] finished writing the grievance and/or received medical attention." [Filing No. 63 at 7.] Sgt. Eaton ordered Mr. Whitelow "to submit to mechanical restraints so that his camera could be uncovered." [Filing No. 47-2 at 2.] Mr. Whitelow removed the window and camera coverings and went near the back of his cell where he began writing a grievance against Sgt. Eaton. [Filing No. 63 at 7; Filing No. 47-15 at 07:50-09:12; *see* Filing No. 47-16 at 46:25-46:40.][6] At the same time, another officer assisting Sgt. Eaton (Sgt. Barker, a non-party in this case), sprayed oleoresin capsicum ("OC Spray") into Mr. Whitelow's cell via the cuff port. [Filing No. 47-2 at 2; Filing No. 47-15 at 17:44-17:48; Filing No. 47-16 at 46:42-46:46.] Sgt. Eaton then handcuffed Mr. Whitelow "in an aggressive way."[7] [Filing No. 63 at 7.] Mr. Whitelow was taken to a decontamination shower.[8] [Filing No. 47-15 at 23:13-23:24; Filing No. 47-17 at 06:25-17:31.] Mr. Whitelow was thereafter escorted to the nurse station, where a nurse "told officers to get [him] out of there because [he] was frustrated and loud with Sgt. Eaton." [Filing No. 63 at 7.] No medical assessment was done. [Filing No. 63 at 7.]

---

[6] Mr. Whitelow alleges that Sgt. Eaton "became angry and, without saying a word, [he] was maced." [Filing No. 63 at 7.] However, the Court does not credit this assertion because video evidence contradicts it.

[7] The video does not necessarily confirm or contradict Mr. Whitelow's characterization of the way Sgt. Eaton handcuffed him. [Filing No. 47-15 at 22:23-23:11.] Rather, the video depicts Mr. Whitelow offering both of his hands through the cuff port with his chest facing the cuff port, but it appears Sgt. Eaton ordered Mr. Whitelow to present his hands to be cuffed from behind rather than in front, and Sgt. Eaton does appear to have some difficulty reaching one of Mr. Whitelow's arms after cuffing the first one. [Filing No. 47-15 at 22:23-23:11.] Therefore, the Court takes the evidence in the light most favorable to Mr. Whitelow.

[8] Mr. Whitelow disputes that he was taken for a decontaminant shower, but the video evidence blatantly contradicts Mr. Whitelow's version. [Filing No. 47-15 at 23:13-23:24; Filing No. 47-17 at 06:25-17:31.]

After the above events took place, Mr. Whitelow was placed on Strip Cell status[9] and his personal property was confiscated. [Filing No. 47-4 at 2; Filing No. 63 at 7.] When Mr. Whitelow returned to his cell, he continued to cover his camera with his hand and a piece of tape. [Filing No. 47-18 at 06:00-26:45.] Mr. Whitelow was again removed from his cell to allow officers to search the cell. [Filing No. 47-18 at 26:58-42:57.] When Mr. Whitelow and his cell were searched, officers found two weapons—a GTL tablet battery pack tied into a sheet and a sharpened metal object. [Filing No. 47-4 at 3; Filing No. 47-18 at 31:18-31:25.] Officers removed the sleeping pad, and Mr. Whitelow was returned to his cell. [Filing No. 47-18 at 43:00-43:14.]

Shortly thereafter, Mr. Whitelow smeared his feces over the window and camera. [Filing No. 47-18 at 56:20-1:15:23.] At no point during these events did Mr. Whitelow receive medical attention for his hand. [Filing No. 63 at 7.]

### D.  May 5 Into May 6 – Mr. Whitelow Receives Conduct Reports

From late May 5, 2020 into the early morning hours of May 6, 2020, Mr. Whitelow received four Conduct Reports. [Filing No. 63 at 8.] The Conduct Reports are as follows:

- Officer Martin wrote a Conduct Report charging Mr. Whitelow with covering his cell's window and camera, preventing staff from monitoring him ("Officer Martin May 5 Conduct Report"). [Filing No. 47-4 at 2; Filing No. 47-4 at 5-6.] Mr. Whitelow pleaded guilty. [Filing No. 47-4 at 5-6.]

- Sgt. Eaton wrote a Conduct Report charging Mr. Whitelow with refusing orders to submit to mechanical restraints ("Sgt. Eaton May 5 Conduct Report"). [Filing No. 47-2 at 3; Filing No. 47- 2 at 4-5.] Mr. Whitelow pleaded guilty. [Filing No. 47- 2 at 4-5.]

- Non-party Officer Clark wrote a Conduct Report which Officer Martin signed charging Mr. Whitelow with possession of the weapons found during the search of his person and his property. [Filing No. 47-4 at 3;

---

[9] The parties do not define the term Strip Cell status, but as best the Court can tell, it means that officers removed almost everything from Mr. Whitelow's cell except a sleeping pad. [*See* Filing No. 47-18 at 00:00-00:38.]

Filing No. 47-4 at 7-8.] Mr. Whitelow pleaded not guilty. [Filing No. 47-4 at 8.]

- Officer Martin wrote Conduct Report charging Mr. Whitelow with using his feces to cover his cell's camera and window ("Officer Martin May 6 Conduct Report"). [Filing No. 47-4 at 3; Filing No. 47-4 at 9-10.] Mr. Whitelow pleaded guilty. [Filing No. 47-4 at 9-10.]

From May 5, 2022 until May 10, 2020, Mr. Whitelow "kept showing [his] hand injuries to Sgt. Sgt. Cobb, Sgt. Sgt. Drada, Lt. Allen, Major Russell, Sgt. Eaton, Casework Manager Gonthier, and [Officer] Martin during their routine rounds at the SCU but all these staff members ignored [his] serious medical need." [Filing No. 63 at 8.]

### E.  May 10 Through 12 – Mr. Whitelow Receives X-Rays and a Medical Brace

On May 10, 2022, Mr. Whitelow submitted a Health Care Request Form, in which he noted that "[his] hand was smashed in the door by C.O.'s and appears to be broken. . .  Male nurse on [T]hursday said [I] was put in for x-ray but [N]urse Perez said I was not put in[.] Can [I] please be seen before damage is permanent."[10] [Filing No. 57 at 3.] Health care staff responded to Mr. Whitelow's request, noting "x-rays ordered." [Filing No. 57 at 3.] Mr. Whitelow's left hand was subsequently x-rayed, and the x-rays revealed that the fifth metacarpal, the bone that connects the wrist to the pinkie finger, on Mr. Whitelow's left hand was fractured. [Filing No. 47-1 at 104-05; Filing No. 63 at 8.] He was "given an ulnar gutter splint ('medical brace')," pain relief medication, and "a frontward handcuffing permit by medical staff." [Filing No. 63 at 8.]

---

[10] May 10, 2020 was a Sunday.  The Thursday before May 10, 2020 was May 7, 2020.

### F.  May 20 – Mr. Whitelow Submits a Grievance Against Sgt. Eaton

On May 20, 2020, Officer Wellington received an Offender Grievance from Mr. Whitelow.

[Filing No. 47-10 at 1.]  Officer Wellington supervised and responded to offender grievances.

[Filing No. 47-10 at 1.]  In his grievance, Mr. Whitelow wrote:

On 5-4-20 Sgt. Eaton and [two] other staff escorted me from R7R to 2range between the hours of 7pm-9pm.  I asked why am I going to the "COVID" range. He ([Defendant] Eaton) stated "because you have symptoms."  Take into mind that all I was given in R&R was a temperature test for the 10 or so minutes I was in there.  I was unable to identify the other two C.O.s due to them putting on "white suits" and taking me in through the back of 2 range, through the rec cages.  Sgt. Eaton identified himself by saying "wassup Whitelow remember me" and I say "yeah." After walking me past a huge blue trash can, where they parked [the] van I say "y'all putting me in trash?"  [Defendant] Eaton says "yeah, after COVID finishes with you, all we need is your dental records."  After uncuffing me in the cell/trap my left hand is slammed in the trap of the door and as they walk away he says "that will teach you to [not] assault staff."

On 5-12-20 after putting in several requests and showing several Ofc's Ivy, Hill, Sgt. Sgt. Drada, Sgt. Sgt. Cobb, Lt. Small, Lt. Allen, Major Russel and several nurses, I was ignored and neglected for a week until I showed a nurse how swollen, disfigured and discolored my hand was she put me in for an x-ray, which confirmed a broken/fractured hand and I was given a hard cast for my hand and arm. Throughout the night on 5-4-20 & 5-5-20 I requested and begged Sgt. Eaton & Sgt. Martin to see medical and I.A. (O.I.I.).  I had to keep putting tissue on the camera to get officers to even stop at my cell.

Sgt. Eaton on 5-5-20 night shift comes to my door and says "if I have to come in there it's over for you."  Sgt. Martin came to my door and I complied by taking the tissue off the camera and I said "I need to take to I.A. because staff is trying to kill me."  She said she will email O.I.I.

Around 10 pm Sgt. Eaton comes to my door and says "didn't I tell you don't make me come back, now cuff up."  I was literally at my desk writing a request slip and I say "hold up let me finish this grievance on you and put it in my bag."  I held up a request slip that I was writing my informal on and he sprayed me.  (see camera footage on 5-5-20 at 10pm-11pm).  Sgt. Eaton and CO.'s escorted me to medical and refused me a chemical shower even after being sprayed.  I alerted staff that I was still high off crystal meth and PCP, instead of staff de-escalating [the] situation, they (staff) recognized that I wasn't in the right state of mind and used that to antagonize and taunt me.

> My rights have been consistently violated and I was in so much fear of more retribution that I broke my tablet . . . [remaining words of the last sentence are illegible].

[Filing No. 47-10 at 4-5 (cleaned up and paragraph breaks added).]

Upon receipt of the Offender Grievance, Officer Wellington requested an "informed response" from Major Russell (supervisor of Sgt. Eaton) and "also reviewed video of all the alleged incidents in [Mr.] Whitelow's Offender Grievance." [Filing No. 47-10 at 2; Filing No. 47-10 at 5.] After his investigation, Officer Wellington issued a report stating:

> I have reviewed the video from the incident as well as reviewed relative documentation. It appears as though your entire complaint is false from the beginning. You were placed on the 200 range as a new intake and was later moved to B401 for camera placement. Video clearly shows that you covered your cell camera multiple times. You did uncover the camera when staff came to see you but then you cover[ed] it back up when they walk[ed] away. You were finally asked to submit to the application of mechanical restraints so you could be removed from the cell and you failed to comply with staff orders, therefore, being sprayed with OC. You were seen by medical staff, documented, and you were given a decontamination shower on the 600 range, videoed, and documented. As for the claim on your hand, I do not believe this was the actions of staff, rather the actions of yourself being mad at the situation.
>
> GRIEVANCE DENIED.

[Filing No. 47-10 at 6.] Officer Wellington then wrote a Conduct Report charging Mr. Whitelow with "making a false/fictitious claim" (the "Officer Wellington Conduct Report"). [Filing No. 47-10 at 2; Filing No. 47-10 at 7.]

After Mr. Whitelow was informed of the Officer Wellington Conduct Report and entered a plea of not guilty, Disciplinary Hearing Officer ("DHO") Wadhwan[11] became involved. [Filing No. 47-11 at 1.] After a disciplinary hearing, DHO Wadhwan found Mr. Whitelow guilty, laughing,

---

[11] Although Mr. Whitelow names "L. Wadwhan" as a defendant in his Second Amended Complaint, that individual's name is actually "L. Wadhwan." [Filing No. 47-11 (Affidavit of L. Wadhwan).] The **CLERK** is **DIRECTED** to change Defendant "L. Wadwhan" to "L. Wadhwan," and the Court will refer to her by her correct name in this Order.

and saying "I don't know why you guys write grievances on staff to get them in trouble then expect trouble not to follow."[12]  [Filing No. 47-11 at 1-2; Filing No. 63 at 9.]  Mr. Whitelow was issued sanctions.  [Filing No. 47-11 at 2.]

### G.  May 28 - Mr. Whitelow Sprays Officers and Staff Members with Bodily Waste

On May 28, 2022, Officer Troup,[13] Sgt. Sgt. Drada, and other correctional staff members approached Mr. Whitelow's cell to escort him to recreation and for a shower.  [Filing No. 47-5 at 1; Filing No. 47-6 at 1; Filing No. 47-19 at 00:00-00:29.]  Officer Troup secured Mr. Whitelow's hands (one of which had the medical brace on it) with hand cuffs via the cuff port.  [Filing No. 47-19 at 01:10-01:50.]  Officer Troup "placed handcuffs on [Mr. Whitelow's] already broken hand and tightened them as much as possible, all while [Mr. Whitelow] yelled in pain so much pain that [he] went blank and acted involuntarily out of fear in the moment."  [Filing No. 63 at 9.]  As the cell door was being opened, Mr. Whitelow quickly asserted himself forward with a bottle in his hands.  [Filing No. 47-5 at 1; Filing No. 47-19 at 02:01-02:04.]  Mr. Whitelow then used the bottle to spray his bodily waste in the faces of Officer Troup and the other correctional staff members present.  [Filing No. 47-19 at 02:04-02:07.]  Immediately after spraying his bodily waste on the correctional

---

[12] Defendants submit evidence that DHO Wadhwan did not say these words to Mr. Whitelow, [Filing No. 47-11 at 2], but because Mr. Whitelow submits conflicting evidence, [Filing No. 63 at 9], the Court gives Mr. Whitelow the benefit of the conflicting evidence, as required by the summary judgment standard.  *Ziccarelli*, 35 F.4th at 1083.  Mr. Whitelow, however, asserts no due process claim in connection with his disciplinary hearing.  [Filing No. 11; Filing No. 14 at 9 (the Court's Screening Order not identifying such a claim and giving Mr. Whitelow several weeks to identify any claims that he believed were alleged in the Second Amended Complaint but not identified by the Court, to which Mr. Whitelow did not file a response identifying any claims).]

[13] Although Mr. Whitelow names "Troupe" as a defendant in his Second Amended Complaint, that individual's name is actually "Troup."  [Filing No. 47-5 (Affidavit of Troup).]  The **CLERK** is **DIRECTED** to change Defendant "Troupe" to "Troup," and the Court will refer to her by her correct name in this Order.

staff members, a non-party officer acted quickly and pushed Mr. Whitelow back into his cell.[14] [Filing No. 47-19 at 02:06-02:08.] Mr. Whitelow's handcuffs were then removed via the cuff port. [Filing No. 47-19 at 04:30-04:58.] Mr. Whitelow requested medical attention, but he was not taken to medical due to "being a security risk at this time." [Filing No. 57 at 11.]

After being assaulted by Mr. Whitelow with his bodily waste, Officer Troup exited the range and was not permitted back on Mr. Whitelow's range due to her status as a victim. [Filing No. 47-5 at 2.] As Officer Troup left the range, she said not to take Mr. Whitelow "to medical to address any injuries." [Filing No. 63 at 9.] Officer Troup wrote a Conduct Report charging Mr. Whitelow for using his bodily waste to assault her. [Filing No. 47-5 at 2; Filing No. 47-5 at 3-4.]

### H.  Mr. Whitelow Is Searched and Placed on Strip Cell Sack Meals

Mr. Whitelow was later extracted from his cell and escorted to a shower where he was searched and stripped of his clothing pursuant to a Strip Cell status. [Filing No. 47-3 at 2; Filing No. 47-7 at 1.] In the shower, Mr. Whitelow remained in restraints for "safety and security purposes." [Filing No. 47-3 at 2; Filing No. 47-7 at 2.] Because he remained in handcuffs for safety reasons, Mr. Whitelow's jumpsuit was cut off. [Filing No. 47-7 at 2; Filing No. 63 at 9.] Officers then inspected Mr. Whitelow's medical brace and found a small piece of metal.[15] [Filing No. 63 at 9.] Major Russell ordered the medical brace to be removed "because [Mr. Whitelow]

---

[14] Mr. Whitelow testified that he was "slammed . . . on the floor" by the push. [Filing No. 63 at 9.] Video evidence blatantly contradicts Mr. Whitelow's testimony, which irrefutably establishes that Mr. Whitelow remained standing. [Filing No. 47-19 at 02:06-02:10.]

[15] Defendants contend and submit evidence that Mr. Whitelow's medical brace was actually a non-medically issued cloth wrapped around his hand and that they found "a sharp-edged weapon" in Mr. Whitelow's hand wrap. [Filing No. 48 at 8 (citing Filing No. 47-3 at 2; Filing No. 47-7 at 2).] Mr. Whitelow, however, argues and submits admissible evidence (via his affidavit) that he had his medical brace issued by medical staff during this search and that what was found was "a small metal piece." [Filing No. 62 at 9-10 (citing Filing No. 63 at 9).] The Court gives Mr. Whitelow the benefit of conflicting evidence, as required by the summary standard judgment.

was abusing the [medical brace] by concealing a homemade weapon." [Filing No. 47-3 at 2; Filing No. 47-7 at 2.] Mr. Whitelow testified that Major Russell removed his medical brace out of retaliation for calling him the "grand wizard." [Filing No. 47-1 at 99.] Major Russell then told Mr. Whitelow that "he was ordering 'strip-cell sacks' of food [("Strip Cell Sack Meals")] for [Mr. Whitelow] three times a day for the remainder of my stay at the SCU and that [Mr. Whitelow] would lose weight like every other problematic prisoner." [Filing No. 63 at 9.] Mr. Whitelow testified that he believed Major Russell ordered the Strip Cell Sack Meals and said that to him again out of retaliation for calling him the "grand wizard." [Filing No. 47-1 at 99-101.]

Changes to an offender's diet require approval from the Wabash Valley Warden.[16] [Filing No. 47-3 at 2-3.] No matter what changes may be made to an offender's diet, offenders always receive at least three meals per day. [Filing No. 47-3 at 3; see Filing No. 47-1 at 130-32.] Mr. Whitelow testified that during the time he the Strip Cell Sack Meals, he received three per day, one at breakfast, one at lunch, and one at dinner, and that the meals always consisted of four pieces of bread, usually two slices of meat or two slices of cheese, a little juice packet, and a dessert item like a cookie. [Filing No. 47-1 at 130.] Mr. Whitelow received these bagged meals for "at least like a month, a month and some change." [Filing No. 47-1 at 131.]

Forty-five minutes after Major Russell ordered Mr. Whitelow's medical brace to be removed, Doctor Byrd (the non-party doctor who was treating Mr. Whitelow's hand injury, among other conditions) was informed of the events pertaining to the spray bottle of bodily waste and Mr. Whitelow's Strip Cell status, which resulted in his medical brace being search and ultimately cut

---

[16] Mr. Whitelow disputes this fact and cites several pieces of evidence, but none of the evidence specifically disputes the fact that the Warden must approve changes to an offender's diet. [See Filing No. 62 at 13.]

off.  [Filing No. 57 at 9; Filing No. 63 at 10.]  Dr. Byrd reviewed the video evidence of the events and advised "splint will be removed from his possession.  This may ultimately affect the healing and long term prognosis of this 5th [metacarpal] joint, but we are left with no choice but to confiscate this splint unfortunately."  [Filing No. 57 at 9.]

### I.  May 29 – Mr. Whitelow Possessed Another Water Bottle

On May 29, 2020 (the next day), Mr. Whitelow was still on Strip Cell status and not allowed to have property items, including a water bottle.  [Filing No. 47-8 at 1; Filing No. 47-9 at 1.] Nevertheless, Sgt. Chambers and Sgt. Pirtle were informed on May 29, 2020 that Mr. Whitelow was in possession of a water bottle and that Mr. Whitelow likely intended to use the bottle to assault staff with his bodily waste again.  [Filing No. 47-8 at 1; Filing No. 47-9 at 1.]  Sgt. Chambers and Sgt. Pirtle went to Mr. Whitelow's cell to retrieve the bottle and spoke with him for several minutes in an attempt to retrieve the bottle.  [Filing No. 47-8 at 2; Filing No. 47-9 at 1-2; Filing No. 47-20 at 00:00-14:35.]  Sgt. Chambers and Sgt. Pirtle ordered Mr. Whitelow to show his hands to ensure they were empty and to submit to wrist restraints so that they could enter his cell and retrieve the bottle.  [Filing No. 47-8 at 2; Filing No. 47-9 at 1-2.]  Mr. Whitelow refused to comply with multiple orders from Sgt. Chambers and Sgt. Pirtle and was provided with multiple warnings regarding the potential use of OC Spray.[17]  [Filing No. 47-8 at 2; Filing No. 47-9 at 2.]  Mr. Whitelow was provided time to comply with orders given.  [Filing No. 47-8 at 2; Filing No. 47-9 at 2.]

When the cuff port for Mr. Whitelow's cell was opened, Mr. Whitelow "tried to hand [Sgt.] Chambers the water bottle . . . , [and Sgt.] Pirtle maced [Mr. Whitelow] under the cell door, and

---

[17] Mr. Whitelow does not dispute that he was given multiple warnings regarding the potential use of OC Spray.  [Filing No. 63 at 11.]

then [Sgt.] Chambers stated to [Mr. Whitelow], "stew on that for a while, n*****."[18]  [Filing No. 47-21 at 17:47-17:59; Filing No. 63 at 10.]  Following the use of OC Spray, Mr. Whitelow complied with orders and was removed from his cell without further issue.  [Filing No. 47-8 at 2; Filing No. 47-9 at 2.]  Mr. Whitelow was then given a decontamination shower.  [Filing No. 47-9 at 2; Filing No. 47-20 at 10:00-14:35.]

**J.  July 10 – Mr. Whitelow Requests and Receives a High Protein Diet from Dr. Byrd**

On July 10, 2020, during a medical visit with Dr. Byrd, Mr. Whitelow discussed weight loss with Dr. Byrd.  [Filing No. 57 at 19.]  Mr. Whitelow requested a high protein diet due to weight loss and told Dr. Byrd that "his weight [was] down 230 to 203 lbs."  [Filing No. 57 at 19.]  Mr. Whitelow testified that "each time [he] notified medical staff and [Major] Russell via [Health Care Request Forms] that the 'strip-cell sacks' (paper bag sacks of food) three per day was causing [him] weight loss[,] [Major] Russell took no action whatsoever and the medical doctor [Dr.] Byrd only took action on 7/10/2020 after [he] los[t] over 30 pounds."  [Filing No. 63 at 10.]  Mr. Whitelow also testified that "Major Russell ordered the strip cell sacks for [him] as punishment for strip-cell status."  [Filing No. 63 at 10.]

**K.  This Lawsuit**

Mr. Whitelow filed this *pro se* lawsuit on May 9, 2022, and his Second Amended Complaint on October 17, 2022.  [Filing No. 1; Filing No. 11.]  The Court screened Mr. Whitelow's Second

---

[18] Mr. Whitelow testified that Sgt. Pirtle "maced [his] testicles."  [Filing No. 63 at 10.]  The video evidence shows that Sgt. Pirtle slid the mace nozzle under the door and sprayed Mr. Whitelow.  [Filing No. 47-21.]  The mace began spraying at Mr. Whitelow's feet and shins, and as Mr. Whitelow backed away from the cell door, the mace appears to be sprayed all over.  [Filing No. 47-21 at 17:47-17:59.]  While the mace spray likely made contact with most of Mr. Whitelow's body during the course of the spray burst, any assertion that the mace was directed at Mr. Whitelow's testicles is wholly unsupported by the video.  [Filing No. 47-21 at 17:47-17:59.]

Amended Complaint pursuant to 28 U.S.C. § 1915A, and found that the following claims would proceed:

1. Eighth Amendment excessive force claims against Sgt. Eaton, Officer Troup, Sgt. Chambers, Sgt. Pirtle, Sgt. Cobb, and Lt. Small;

2. Eighth Amendment conditions of confinement claim relating to the Strip Cell Sack Meals against Major Russell;

3. First Amendment retaliation claims against Sgt. Eaton, Officer Martin, Officer Wellington, DHO Wadhwan, and Major Russell;

4. Fourteenth Amendment race-based equal protection claim Sgt. Chambers; and

5. Eighth Amendment deliberate indifference to medical care against Sgt. Eaton, Major Russell, Casework Manager Gonthier, Officer Martin, Sgt. Cobb, Sgt. Sgt. Drada, Lt. Small, and Lt. Allen;

[Filing No. 14.]

### III.
### DISCUSSION

#### A.   Eighth Amendment Excessive Force Claims

Mr. White alleges several occurrences of excessive force by different Defendants.  The Court analyzes each separately.

##### 1.   Sgt. Eaton

###### a.   Hands in Cuff Port on May 4, 2020

Defendants argue that Sgt. Eaton is entitled to summary judgment on the claim that he used excessive force against Mr. Whitelow on the evening of May 4, 2020 while Mr. Whitelow's hand were in the cuff port.  [Filing No. 48 at 14.]  Defendants argue that the video evidence of Mr. Whitelow's arrival shows that "no act of excessive force, or even physical force, occurred" when Mr. Whitelow's hands were in the cuff port and therefore blatantly contradicts Mr. Whitelow's allegations.  [Filing No. 48 at 14.]

Mr. Whitelow argues that the video evidence does not blatantly contradict his version of events because the video was fully obstructed and does not show the inside of his cell, where he alleges his hand and fingers were trapped. [Filing No. 62 at 14.] He asserts that the cuff port could not be fully secured until his hand and fingers were freed after he pushed the cuff port back open, which is seen on video. [Filing No. 62 at 14-15.] Mr. Whitelow argues that Defendants cannot maintain or show that the force that was used was *de minimis* because his later x-rays revealed a fractured hand bone. [Filing No. 62 at 15.]

In reply, Defendants reiterate their argument regarding the video evidence, highlighting that "the video shows that [Sgt.] Eaton and other officers present were calmly interacting with [Mr. Whitelow] and calmly closed the cuff port." [Filing No. 64 at 2.] Defendants further argue that, even if Mr. Whitelow's hand was closed in the cuff port, Mr. Whitelow has not made any showing that it was an act of force rather than an accident, which is fatal to his claim. [Filing No. 64 at 2-3.]

The Eighth Amendment protects inmates from cruel and unusual punishment, including excessive force by prison officials and the infliction of "unnecessary and wanton" pain on prisoners. *Jones v. Anderson*, 116 F.4th at 677 (quoting *Hudson v. McMillian*, 503 U.S. 1, 5 (1992)); *McCottrell v. White*, 933 F.3d 651, 662 (7th Cir. 2019). But not every "malevolent touch" by a prison officer implicates the Constitution. *Hudson*, 503 U.S. at 9. "The use of *de minimis* force, so long as it 'is not of a sort repugnant to the conscience of mankind,' is not of Eighth Amendment concern." *Lewis v. Downey*, 581 F.3d 467, 475 (7th Cir. 2009) (quoting *Hudson*, 503 U.S. at 9-10)); *Jones*, 116 F.4th at 677-78.

Even if the force applied is more than *de minimis*, it remains permissible if it "was applied in a good-faith effort to maintain or restore discipline" and not "maliciously and sadistically to

cause harm." *Hudson*, 503 U.S. at 7.  The Court looks to several factors to evaluate "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Jones*, 116 F.4th at 677 (quoting *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986)).  The relevant factors "include the need for the application of the force, the amount of force applied, the threat an officer reasonably perceived, the effort made to temper the severity of the force used, and the extent of the injury that force caused to an inmate." *Jones*, 116 F.4th at 677 (quotations and citations omitted).  Additionally, to survive summary judgment, a plaintiff must present evidence supporting "a reliable inference of wantonness in the infliction of pain." *Whitley*, 475 U.S. at 322.

The video evidence plainly refutes Mr. Whitelow's excessive force claim against Sgt. Eaton.  The footage shows that Sgt. Eaton and the other officers calmly escorted Mr. Whitelow to his cell, placed him inside, and removed his handcuffs through the cuff port—all without incident. [Filing No. 47-12 at 00:00-4:03.]  While Mr. Whitelow points out that the cuff port is not always visible, it is unobstructed during the critical moments immediately before and after its closure. Crucially, in these decisive seconds, the video does not show any use of force—let alone excessive force—by Sgt. Eaton or any other officer.  Once Mr. Whitelow's hand restraints were removed, he took a step back into his cell, and the video provides a clear, unobstructed view of an open and empty (hand-free) cuff port.  [Filing No. 47-12 at 03:35-03:36.]  Just a second later, Sgt. Eaton lifted the cuff port closed with one hand, using slow and controlled movements.  [Filing No. 47-12 at 03:37-03:42.]  There were no quick, jerky motions, nor any indication of force.  When Mr. Whitelow pushed the cuff port back open, the footage reveals a slow, gentle push—not the frantic shove of someone in distress.  [Filing No. 47-12 at 03:40-03:43.]  Sgt. Eaton then closed the cuff port a second time, even more slowly than before.  [Filing No. 47-12 at 03:46-03:48.]  Lastly, and

20

significantly, the video evidence shows that once the cuff port was securely closed, Mr. Whitelow simply walked away from his cell door and did not return as the officers exited the range, nor at any point thereafter.  [Filing No. 47-12 at 03:45-04:14.]  His behavior further undermines any claim that he was subjected to excessive force.  *See Jones*, 116 F.4th at 678 ("The video does not suggest that [plaintiff] was experiencing the level of pain that one would expect if [the defendant officer] had used excessive force when handcuffing him, as [plaintiff] claims. . . .  Jones claims that the bones in his shoulder 'cracked and snapped' during the handcuffing.  But the video shows him sitting comfortably in no apparent pain immediately after he was handcuffed.").

In short, the video evidence flatly contradicts Mr. Whitelow's allegations.  *Id.*; *Scott*, 550 U.S. at 379-80; *Manery*, 124 F.4th at 1077 n.5.  While there is no doubt that Mr. Whitelow sustained a fracture to his fifth metacarpal while at Wabash Valley, there was nothing more than *de minimis* force in the closure of Mr. Whitelow's cuff port for Eighth Amendment purposes as reflected in the irrefutable video evidence.  In other words, "[n]o juror viewing this evidence could reasonably conclude that the officers wantonly and sadistically inflicted pain" on Mr. Whitelow when his cuff port was closed on May 4, 2020.  *Jones*, 116 F.4th at 678.

The Court **GRANTS** Defendants' Motion for Summary Judgment on Mr. Whitelow's claim that Sgt. Eaton used excessive force when closing his cuff port on May 4, 2020.

b.    Use of OC Spray on May 5, 2020

Defendants argue that Sgt. Eaton did not use excessive force on Mr. Whitelow on the night of May 5, 2020, when OC Spray was deployed into Mr. Whitelow's cell because Sgt. Eaton was not the correctional staff member who deployed the OC Spray.  [Filing No. 48 at 15.]  Instead, Defendants assert that non-party Sgt. Barker was the staff member who deployed the OC Spray, but in any event, the use of OC Spray did not violate Mr. Whitelow's Eighth Amendment rights

21

because Mr. Whitelow's lack of cooperation and refusal to comply with orders to stop covering his camera and window created a need for the use of force so that control could be gained over the situation. [Filing No. 48 at 16-17.] They argue that "[u]se of force was only done after numerous attempts to gain compliance from [Mr. Whitelow] for an act which jeopardize[s] the safety and security of the facility" and note that "no physical injuries were caused." [Filing No. 48 at 17.]

Mr. Whitelow argues that Sgt. Eaton visited his cell when Mr. Whitelow was filling out a grievance form against him and told Sgt. Eaton that he would talk to him when he finished filling it out when Sgt. Eaton "then became angry and, without a word, . . . [deployed] mace[]." [Filing No. 62 at 17.]

In reply, Defendants assert that Mr. Whitelow did not dispute or address that Sgt. Barker, rather than Sgt. Eaton, deployed the OC Spray on the night of May 5, 2020. [Filing No. 64 at 3.] They argue that since Sgt. Eaton did not deploy the spray, he cannot be liable under the Eighth Amendment. [Filing No. 64 at 3.] Defendants further argue that even assuming Sgt. Eaton was adequately involved in the use of the OC Spray, Mr. Whitelow does not confront the fact that he continuously covered his cell window and camera and was repeatedly ordered to cease doing so. [Filing No. 64 at 3-4.] Defendants highlight that the video evidence shows that Mr. Whitelow was covering his camera and window and that Defendants attempted to talk to Mr. Whitelow several times before deploying OC Spray. [Filing No. 64 at 4-5.]

"'To recover damages under § 1983, a plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right.'" *Whitfield v. Spiller*, 76 F.4th 698, 706 (7th Cir. 2023) (quoting *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995)). Although the evidence undisputably shows that Sgt. Barker, a non-party, deployed the OC Spray, [Filing No. 47-16 at 46:42-46:46], the Court assumes without deciding that Sgt. Eaton was

personally responsible for the use of OC Spray since he was with Sgt. Barker and because other issues are clearly more dispositive of Mr. Whitelow's claim.

It is not cruel and unusual punishment to use "mace, tear gas or [an] other chemical agent of the like nature when reasonably necessary to prevent riots or escape or to subdue recalcitrant prisoners." *Soto v. Dickey*, 744 F.2d 1260, 1270 (7th Cir. 1984). A prison officer may use small amounts of pepper spray to compel a disobedient prisoner to leave a cell. *Id.*; *see also Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 668 (7th Cir. 2012) (where prisoner had hit his cellmate and refused to comply with order to leave cell, use of pepper spray was justifiable), *abrogated on other grounds by Kemp v. Fulton Cnty.*, 27 F.4th 491, 497 (7th Cir. 2022). But "it is a violation of the Eighth Amendment for prison officials to use mace or other chemical agents in quantities greater than necessary or for the sole purpose of punishment or the infliction of pain." *Soto*, 744 F.2d at 1270.

The video evidence unmistakably shows that on the evening of May 5, 2020, Mr. Whitelow persistently covered his cell's camera and windows, despite multiple direct orders to stop. Officer Martin ordered him once to remove the coverings, while Sgt. Eaton issued at least two additional orders. When Mr. Whitelow refused to comply, he was ordered to submit to mechanical restraints so officers could safely enter his cell and remove the obstructions. [Filing No. 47-2 at 2; Filing No. 47-13 (a 58:49 minute-long video showing Mr. Whitelow continuously covering his camera and door); Filing No. 47-14 at 10:03-41:55; Filing No. 47-15 at 04:55-07:32; Filing No. 47-16 (a 1:01:08 hour-long video further confirming these actions).] Although Mr. Whitelow briefly complied with Officer Martin's directive, he quickly resumed covering his cell's window and camera and later refused to submit to mechanical restraints when ordered by Sgt. Eaton. [Filing

No. 47-4 at 2; Filing No. 47-14 at 10:03-41:55.]  Shortly thereafter, a single burst of OC spray was deployed.  [Filing No. 47-15 at 17:44-17:48; Filing No. 47-16 at 46:42-46:46.]

These circumstances confirm that the use of OC spray was a measured and justified response to Mr. Whitelow's ongoing noncompliance, deployed in a good-faith effort to restore discipline—not as a malicious or sadistic act to inflict harm.  *See Soto*, 744 F.2d at 1270; *Rice ex rel. Rice*, 675 F.3d at 668 (holding that pepper spray was justified when a prisoner struck his cellmate and refused to comply with an order to leave the cell), *abrogated on other grounds by Kemp*, 27 F.4th 491; *McCottrell*, 933 F.3d at 664.  It is undisputed that the correctional staff's ability "to monitor offenders placed in camera cells is an important function for the safety and security of the prison."  [Filing No. 47-4 at 3.]  Mr. Whitelow repeatedly obstructed that monitoring by covering his camera and window and ignored multiple orders to stop.  While Officer Martin informed Mr. Whitelow that he could cover the camera when using the toilet, [Filing No. 63 at 7], that instruction did not apply to his cell's window, which he also covered continuously.  Nor does it justify the prolonged periods during which he kept the camera obscured.

The evidence leaves no genuine dispute of material fact regarding whether the single burst of OC spray on the evening of May 5, 2020 violated Mr. Whitelow's Eighth Amendment rights.  The Court **GRANTS** Defendants' Motion for Summary Judgment on Mr. Whitelow's excessive force claim against Sgt. Eaton related to the deployment of OC Spray on May 5, 2020.

2. *Officer Troup, Sgt. Drada, Lt. Small, Sgt. Cobb, and the Other Officers Involved in the Events on May 28, 2020*

a.  Handcuffing by Officer Troup

Defendants argue that Officer Troup is entitled to summary judgment on Mr. Whitelow's claim that on May 28, 2020, Officer Troup tightened his hand restraints "all the way down" because video evidence shows that Officer Troup did not place any restraints on Mr. Whitelow and only

instead reached in the direction of Mr. Whitelow's hands as they were being placed in restraints but did not grab or tighten the restraints.  [Filing No. 48 at 17.]

Mr. Whitelow argues that "Officer Troup did help place handcuffs on [his] already broken hand and tightened them as much as possible, all while [he] yelled in pain so much that [he] went blank and acted involuntarily out of fear in the moment."  [Filing No. 62 at 19.]

In reply, Defendants reiterate their argument that the video evidence "shows a male officer placing the restraints on [Mr. Whitelow's] wrists while Officer Troup stands beside [Mr. Whitelow's] door" and that although the video shows that Officer Troup reached toward Mr. Whitelow's hand restraints, the video contradicts Mr. Whitelow's assertion that she excessively tightened his restraints.  [Filing No. 64 at 6.]

Here, the video evidence indisputably confirms that Officer Troup was not the officer who placed the hand restraints on Mr. Whitelow.  [Filing No. 47-19 at 00:38-01:55.]  But the video evidence does show that Officer Troup briefly reached toward Mr. Whitelow's restraints.  [Filing No. 47-19 at 00:38-01:55.]  Since the video evidence does not show the extent of Officer Troup's involvement via her reach, the Court cannot say that as a matter of law Officer Troup was not personally responsible for tightening Mr. Whitelow's hand restraints.

Nevertheless, video evidence following the tightening of Mr. Whitelow's hand restraints undermines Mr. Whitelow's allegations.  The video evidence clearly shows that after his hand restraints were put on and after the assault with his bodily waste (addressed separately below), Mr. Whitelow was pushed back into his cell with both of his hand restraints on.  [Filing No. 47-10 at

01:55-02:15.][19]   However, moments later, when an officer opened his cuff port to remove the restraints, Mr. Whitelow required assistance only to unlock the restraint on his right, uninjured hand.  [Filing No. 47-19 at 04:00-04:30.]  The footage unmistakably shows that after the officer unlocked the restraint on his right hand, Mr. Whitelow handed over the remaining restraints without any further help.  [Filing No. 47-19 at 04:00-4:30 (video showing the officer unlocking and opening Mr. Whitelow's cuff port; Mr. Whitelow extending his right, medical-brace-free hand; the officer unlocking and retrieving the restraint from his hand; and Mr. Whitelow producing the remainder of the hand restraints to the officer without need for further assistance).]  In other words, Mr. Whitelow was able to slip the restraint off his left hand entirely on his own, directly contradicting his claim that it was excessively tightened by Officer Troup.  His own actions refute his allegations, making summary judgment appropriate.

The Court **GRANTS** Defendants' Motion for Summary Judgment on Mr. Whitelow's claim that Officer Troup used excessive force in connection with tightening the hand restraint on his fractured left hand on May 28, 2020.

         b.    <u>Pushed Back into Cell After Spraying Officers With His Bodily Waste</u>

Defendants argue that they are entitled to summary judgment on Mr. Whitelow's excessive force claim that he was "slammed on the concrete floor" after being pushed back into his cell after spraying Officer Troup, Sgt. Drada, and other correctional staff members with his bodily waste because the video evidence clearly shows that Mr. Whitelow remained standing after a necessary push back into his cell "to protect staff members from the assault that [Mr. Whitelow] was carrying

---

[19] To be sure, the video evidence irrefutably establishes that Mr. Whitelow's left hand was initially restrained by the hand restraint.  [Filing No. 47-19 at 02:03-02:06 (video showing that Mr. Whitelow's left hand with the medical brace was cuffed as he stepped out of his cell and began to use the bottle of his bodily waste to spray the officers).]

out." [Filing No. 48 at 17-18.] They argue that the threat of safety was "very large" in that moment and that the push was proportionate to that threat. [Filing No. 48 at 18.]

Mr. Whitelow argues that non-defendant Officer Higar "physically pushed [him] back into the cell and slammed [him] on the floor." [Filing No. 62 at 19.] He asserts that this was excessive force. [Filing No. 62 at 19.]

Defendants reiterate their arguments in reply. [Filing No. 64 at 6-7.]

Here, the video evidence again leaves no room for doubt: Mr. Whitelow remained standing in his cell after he was pushed back inside. [Filing No. 47-19 at 02:02-02:12.] Just moments earlier, he had stepped out of his cell and deliberately sprayed a water bottle filled with bodily waste directly into the faces of Officer Troup, Sgt. Drada, and others. [Filing No. 47-19 at 02:03-02:12.] Yet, Mr. Whitelow does not acknowledge these events or address the indisputable video evidence. Instead, he reiterates that that was "slammed" onto the floor. Despite his assertions, the record contains no genuine dispute of material fact or admissible evidence supporting his claim that his Eighth Amendment right to be free from excessive force was violated by the officer pushing him back into his cell. The video evidence confirms that the push was a non-violent, proportional, and necessary response to the immediate threat he created by spraying his bodily waste in the officers' faces, was executed in a good-faith effort to restore discipline and protect staff, and was not repugnant to the conscience of mankind. *See Jones*, 116 F.4th at 678 (finding that *de minimis*, non-violent physical contact in the form of placing plaintiff in a restraint chair, applying leg restraints, and holding him up during a strip search did not implicate the Eighth Amendment and that no reasonable juror could conclude that the officers wantonly and sadistically inflicted pain on the plaintiff during those events); *McCottrell*, 933 F.3d at 664; *Whitley*, 475 U.S. at 321. Defendants have therefore demonstrated that summary judgment is warranted.

27

In short, the video evidence is fatal to Mr. Whitelow's claim.  No reasonable juror could conclude that the officers used more than the minimal necessary force required to control the situation and maintain discipline or that it was malicious.  The Court **GRANTS** Defendants' Motion for Summary Judgment on Mr. Whitelow's claim that he was subjected to excessive force in connection with being pushed back into his cell after spraying his bodily waste on correctional staff members on May 28, 2020.

c.   <u>Removal of Clothing and Medical Brace by Lt. Small and Sgt. Cobb</u>

Defendants argue that they are entitled to summary judgment on Mr. Whitelow's claim of excessive force related to Lt. Small and Sgt. Cobb cutting off Mr. Whitelow's clothing and his medical brace because neither were acts of force and even if seen as acts of force, they were not excessive.  [Filing No. 48 at 19-20.]  Defendants highlight that while Mr. Whitelow was being searched after he sprayed his bodily waste on the officers, the officers found a piece of metal concealed in his medical brace.  [Filing No. 48 at 19.]  They assert that the piece of metal along with the prior assault on staff with his bodily waste justified the removal of Mr. Whitelow's medical brace "to ensure the safety of the staff and prison facility."  [Filing No. 48 at 19.]  Defendants argue that it was also necessary to keep Mr. Whitelow restrained while his body was searched and that because he was restrained, the only way to remove Mr. Whitelow's clothing was to cut it off.  [Filing No. 48 at 19.]  They assert that even if considered to be force, their actions were necessary, proportionate, and reasonable to the threat that Mr. Whitelow posed under the circumstances of the prior bodily waste assault.  [Filing No. 48 at 20.]

Mr. Whitelow argues that "Major Russell directed that [his] jumpsuit and medical brace be cut off with scissors" and that while it occurred, Mr. Whitelow saw "a small metal piece appeared from the brace after it was cut."  [Filing No. 62 at 19.]  He asserts that his "medical brace was

28

issued to [him] by medical on 5/12/2020 . . . [a]nd no medical order was retrieved by Major Russell to remove the medical brace until 45 minutes after the incident." [Filing No. 62 at 19 (citations omitted).]

In reply, Defendants assert that it is "undisputed that upon [Mr. Whitelow's medical brace] being searched, a [piece of metal] was found" and reiterate that as a direct result, Major Russell "ordered the wrap be removed because [Mr. Whitelow] was improperly using the wrap to conceal weapons." [Filing No. 64 at 8.] They reiterate that Mr. Whitelow has produced no admissible evidence that force was used to remove his medical brace or clothing, and that even if the removals amount to force, the actions "were in a good faith effort to restore discipline" and ensure the facility's safety. [Filing No. 64 at 8-9.]

Unlike the previous incidents, this interaction was not captured on video. However, Mr. Whitelow has failed to present any evidence creating a genuine dispute of material fact to support his claim that excessive force was used during the removal of his medical brace and clothing. The undisputed evidence shows that Mr. Whitelow's jumpsuit was cut off because he remained in restraints for safety and security reasons after assaulting multiple correctional staff members with his bodily waste just moments earlier. [Filing No. 47-3; Filing No. 47-7; Filing No. 63 at 9.] Accordingly, there is no genuine dispute that the removal of his clothing was done in a good faith effort to maintain order, was proportionate to the situation, was reasonable under the circumstances, and was not malicious. This is especially evident given that later video footage irrefutably confirms that Mr. Whitelow received new, uncut clothing. [Filing No. 47-21 (video of Mr. Whitelow in his cell on May 29, 2020).]

The same reasoning applies to the removal of Mr. Whitelow's medical brace. It is undisputed that a search of the brace revealed a concealed "small piece of metal." [Filing No. 63

at 9.] Given Mr. Whitelow's recent act of bodily waste aggression, removing the brace—even without prior medical approval—was a *de minimis* and justified security measure. Further, Mr. Whitelow has offered no evidence suggesting that the removal was done maliciously or sadistically to inflict harm or that the removal was painful. Instead, the record confirms that it was a necessary step to ensure institutional safety and restore order.

Even if the removal of the medical brace was considered more than *de minimis* force, consideration of the relevant factors warrants the same conclusion as above: "the need for the application of the force, the amount of force applied, the threat an officer reasonably perceived, the effort made to temper the severity of the force used, and the extent of the injury that force caused to an inmate." *Jones*, 116 F.4th at 677 (quotations and citations omitted). To start, the need for removal of the brace was great given the prior assault. Next, the amount of force was minimal, and Mr. Whitelow did not allege that the removal was painful or caused long-term damage. [*See* Filing No. 62; Filing No. 63.] Lastly, the officers reasonably perceived the small metal piece to be a threat, particularly given the prior events and the fact that Mr. Whitelow was previously found with weapons. [Filing No. 47-3 at 3; Filing No. 47-18 (undisputed evidence establishing that on May 5, 2020, Mr. Whitelow was found in his cell with a GTL battery tied into a sheet and a sharpened metal object, which is shown on the video).] Consideration of the evidence (or lack thereof) and the relevant factors reveals that no reasonable juror could find that the removal of Mr. Whitelow's medical brace was done "maliciously and sadistically for the very purpose of causing harm." *Jones*, 116 F.4th at 677. These acts did not run afoul of the Eighth Amendment.

The Court **GRANTS** Defendants' Motion for Summary Judgment on Mr. Whitelow's claim that he was subjected to excessive force when his jumpsuit was cut off and his medical brace removed on May 28, 2020.

### 3. *Sgt. Chambers and Sgt. Pirtle*

Defendants argue that they are entitled to summary judgment on Mr. Whitelow's claim that Sgt. Chambers and Sgt. Pirtle used excessive force on him on May 29, 2020 when they deployed OC Spray into his cell. [Filing No. 48 at 20.] They argue that the use of OC Spray in this instance "was proportionate under the circumstances" because they were alerted that Mr. Whitelow had obtained yet another water bottle, despite being on Strip Cell status for his water bottle bodily waste assault the previous day, and that Mr. Whitelow refused to comply with orders to be placed in hand restraints so that officers could open his cell and retrieve the water bottle safely. [Filing No. 48 at 20 (citations omitted).] Defendants cite to the video evidence of the events, which they contend establishes that utilization of the OC Spray was not excessive, and highlight numerous attempts made by Sgt. Chambers and Sgt. Pirtle to communicate with Mr. Whitelow and the multiple orders given with which he had ample time to comply, and multiple warnings of the potential use of OC Spray. [Filing No. 48 at 21 (citations omitted).] They argue that based on Mr. Whitelow's recent actions with a water bottle, "the threat of safety to [Sgt.] Chambers and [Sgt.] Pirtle [was] reasonable, if not significant." [Filing No. 48 at 21 (citation omitted).]

Mr. Whitelow argues that "[Sgt.] Chambers and [Sgt.] Pirtle came to [his] cell to retrieve a drinking water bottle but when the cuff port opened and [he] tried to hand [Sgt.] Chambers the water bottle at the cell door, [Sgt.] Pirtle without any need or provocation maced [him] . . . from under the cell door." [Filing No. 62 at 20.]

In reply, Defendants argue that it is undisputed that "[Sgt.] Chambers and [Sgt.] Pirtle were informed that [Mr. Whitelow] was in possession of a bottle while on strip cell status one day after using a bottle to assault staff" and that for several minutes, they attempted to retrieve the bottle by having Mr. Whitelow show that his hands were empty and submit to hand restraints. [Filing No.

64 at 9.] They assert that the video evidence shows that Mr. Whitelow "refused to comply with these demands and when the cuff port was opened, [he] put the bottle up to the cuff port." [Filing No. 64 at 19 (citations omitted).] Defendants reiterate that it was reasonable for them to perceive Mr. Whitelow's actions as a threat to their safety following his water bottle assault the previous day. [Filing No. 64 at 10.] They also reiterate that Mr. Whitelow was provided with multiple warnings of the potential use of OC Spray if he did not comply and was given ample time to comply. [Filing No. 64 at 9-10 (citations omitted).]

Here, the undisputed evidence and the video evidence establish that Sgt. Chambers' and Sgt. Pirtle's use of OC Spray was a reasonable response to a legitimate safety concern and did not violate the Eighth Amendment. *Soto*, 744 F.2d at 1270. Mr. Whitelow does not dispute that he was ordered to place his empty hands through the cuff port for hand restraints and the video evidence clearly shows that he placed the water bottle in the cuff port when it opened, instead of his empty hands as ordered. [Filing No. 47-21 at 17:40-17:59; Filing No. 63 at 10.] Given Mr. Whitelow's lack of compliance and that just a day prior, Mr. Whitelow used a different water bottle to spray his bodily waste in the faces of several correctional staff members, the single burst of OC Spray did not violate Mr. Whitelow's rights. In other words, no reasonable juror could find that the use of OC Spray in this instance was done "maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7; *Soto*, 744 F.2d at 1270.

The Court **GRANTS** Defendants' Motion for Summary Judgment on Mr. Whitelow's claim that he was subjected to excessive force by Defendants Chambers and Pirtle when he was sprayed with OC Spray on May 29, 2020.

In sum, the main question in excessive force claims is whether force was applied in a good faith effort to maintain or restore discipline or was done maliciously and sadistically for the very

purpose of causing harm. *Hudson*, 503 U.S. at 7. Here, on all of his excessive force claims, Mr. Whitelow has failed to produce admissible evidence—due in large part to irrefutable video evidence—from which a finder of fact could infer that Defendants applied force with the intent to punish in any of the above incidents such that they violated Mr. Whitelow's Eighth Amendment rights. Rather, all of the evidence indicates that the above incidents of force were applied in good faith effort to maintain or restore discipline. The Court **GRANTS** Defendants' Motion for Summary Judgment on all of Mr. Whitelow's Eighth Amendment excessive force claims.

### B.    Eighth Amendment Conditions of Confinement Food Claim

Mr. Whitelow alleges that Major Russell's order placing Mr. Whitelow on the Strip Cell Sack Meals (three bagged meals per day) caused him to lose approximately thirty pounds and created an unconstitutional condition of confinement. [Filing No. 11 at 12; Filing No. 14.]

Defendants argue that they are entitled to summary judgment on Mr. Whitelow's conditions of confinement claim against Major Russell because Mr. Whitelow cannot establish either the objective or subjective element of a deliberate indifference claim. [Filing No. 48 at 29-30.]

Mr. Whitelow argues that he meets the objective element because "each time [he] notified medical staff and Major Russell via [Health Care Request Forms] that the 'strip-cell sacks' (paper bag sacks of food) three per day was causing [him] to los[e] weight[,] Major Russell took no action whatsoever and the medical doctor [Dr.] Byrd only took action on 7/10/2020 after [he] had already los[t] over 30 pounds . . . ." [Filing No. 62 at 20.]

Defendants reiterate their arguments in reply and highlight that Mr. Whitelow does not dispute that a change to an offender's diet required approval from the warden and that a discussion would take place involving the warden, assistant warden, Major Russell, and medical staff to determine the reason for the change. [Filing No. 64 at 15-16.]

"To prevail on an Eighth Amendment claim concerning the conditions of his confinement, a prisoner has the burden to prove that the conditions were objectively so severe that he was deprived of 'the minimal civilized measure of life's necessities' and that prison officials acted with 'deliberate indifference' with respect to the conditions." *Jones*, 116 F.4th at 679 (quoting *Farmer*, 511 U.S. at 834). "To prove the objective component of the claim, a prisoner must show that 'the conditions were sufficiently serious as an objective matter' and created 'an excessive risk' to his health and safety." *Jones*, 116 F.4th at 679 (quoting *Thomas v. Blackard*, 2 F.4th 716, 719 (7th Cir. 2021). "To prove the subjective component, he must show that the prison officials he has sued had actual knowledge that he faced 'a substantial risk of serious harm and disregard[ed] that risk by failing to take reasonable measures to abate it.'" *Jones*, 116 F.4th at 679 (quoting *Farmer*, 511 U.S. at 847).

"Prisoners have a right to adequate food, but not to food that is tasty or even appetizing." *Williams v. Berge*, 102 F. App'x 506, 507 (7th Cir. 2004) (internal citations omitted, citing *Farmer*, 511 U.S. at 833; *Antonelli v. Sheahan*, 81 F.3d 1422, 1432 (7th Cir. 1996); and *Lunsford v. Bennett*, 17 F.3d 1574, 1578 (7th Cir. 1994)). Whether "denying a prisoner adequate nutrition" violates the Eighth Amendment depends on "the amount and duration of the deprivation." *Owens v. Lamb*, 2023 WL 3674666, at *2 (7th Cir. May 26, 2023) (citing *Reed v. McBride*, 178 F.3d 849, 853 (7th Cir. 1999)).

Mr. Whitelow's claim fails because he has not presented any evidence demonstrating that the quantity or duration of the Strip Cell Sack Meals—served from May 28, 2020 to July 10, 2020, or approximately six weeks—was unconstitutional. Courts in the Seventh Circuit have consistently held that receiving sack meals instead of hot meals does not violate the Constitution. *See, e.g.*, *Mayberry v. Pulley*, 2024 WL 1435406, at *2 (N.D. Ind. Apr. 2, 2024) ("Receiving sack

meals instead of hot meals does not violate the Constitution."); *Marshall v. Hyatt*, 2021 WL 4034169, at *1 (N.D. Ind. Sept. 3, 2021) ("Plaintiff alleges that for about six weeks he was served cold sack meals three times a day. . . . Clearly, [Plaintiff] did not enjoy eating only cold sack meals for a month and a half, but doing so did not violate the Eighth Amendment.").

Mr. Whitelow's claim also fails because he has not established that Major Russell was aware of and deliberately disregarded a substantial risk of serious harm resulting from the Strip Cell Sack Meals. *See Jones*, 116 F.4th at 679. His assertion that he "notified medical staff and Major Russell via [Health Care Request Forms] that the [Strip Cell Sack Meals were] causing [him] to los[e] weight" and that "Major Russell took no action whatsoever" until Dr. Byrd intervened on July 10, 2020, after he had lost over 30 pounds, [Filing No. 62 at 20; Filing No. 63 at 10], is entirely conclusory. He provides no specific details or citations to evidence showing when he informed Major Russell of his weight loss. Although the Court is not required to scour the record for supporting evidence, *see Grant*, 870 F.3d at 573-74, it conducted a review of Mr. Whitelow's submitted Health Care Request Forms. Of the forms covering the time period when he was on Strip Cell Sack Meals (May 28, 2020, to July 10, 2020), only one was submitted into evidence, and it makes no mention of weight loss or any issue with the sack meals. [Filing No. 57 at 3 (June 3, 2020 Health Care Request Form requesting medical attention for a hand injury and a discussion about sciatica medication).] The forms that do mention weight loss were submitted only after Dr. Byrd had placed Mr. Whitelow on a High Protein Diet. [Filing No. 63 at 24-27.]

Furthermore, there is no genuine dispute of material fact regarding whether Mr. Whitelow objectively faced a substantial risk of serious harm when he was placed on the Strip Cell Sack Meals, *Mayberry*, 2024 WL 1435406, at *2; *Marshall*, 2021 WL 4034169, at *1, or when he

remained on them until Dr. Byrd placed him on the High Protein Diet on July 10, 2020.  When Dr. Byrd examined him on July 10, 2020, he noted in his medical record:

> [Mr. Whitelow] seen today to discuss weight loss.  He is requesting a [high protein] diet with [high protein] sack due to weight loss.  He notes his weight is down from 230 to 203 lbs.  He denies fever, chills, night sweats, adenopathy, decreased appetite, or other symptom of concern.  No lab work up to date. He is on commissary restriction in disciplinary segregation, so this is likely the cause of this.  He will be place[d] on [high protein] diet and [high protein] sack for 30 days to simply ensure he can gain weight.  If he does gain weight, then serious health condition not likely.

[Filing No. 57 at 19.]  Dr. Byrd's own assessment confirms that Mr. Whitelow's weight loss was not indicative of a serious health risk.  His placement on the High Protein Diet was a precaution, not a medical necessity.  Given this evidence, Mr. Whitelow cannot establish that Major Russell acted with deliberate indifference, and his claim fails as a matter of law.

The Court **GRANTS** Defendants' Motion for Summary Judgment on Mr. Whitelow's claim that Major Russell violated the Eighth Amendment in connection with the Strip Cell Sack Meals.

### C.    First Amendment Retaliation Claims

Mr. Whitelow asserts multiple retaliation claims.  He alleges that Sgt. Eaton retaliated against him by placing him a COVID-19 unit and by submitting the Sgt. Eaton May 5 Conduct Report, which he contends was false; that Defendant Martin retaliated against him by writing the Defendant Martin May 5 Conduct Report and the Defendant Martin May 6 Conduct Report; that Officer Wellington and DHO Wadhwan retaliated against him for his grievance against Sgt. Eaton by submitting a false Conduct Report against him based on his grievance and DHO Wadhwan finding him guilty; and that Major Russell retaliated against him by ordering that his medical brace be removed and that he be placed on Strip Cell Sack Meals.  [Filing No. 11 at 6-9; Filing No. 14.] The Court analyzes each claim separately.

1.   *Sgt. Eaton*

   a.   <u>Placement in COVID-19 Range</u>

Defendants argue that Mr. Whitelow cannot show a prima facie case of retaliation on this claim. [Filing No. 48 at 22.] They contend that Mr. Whitelow cannot show that he engaged in a protected activity under the First Amendment prior to the placement and, even if he could, he has failed to show that the motivating factor behind the placement was due to any protected activity. [Filing No. 48 at 22.] They assert that Mr. Whitelow's "initial placement in a COVID range was purely accidental and not purposely done" and "[o]n the next day, when Major Russell discovered the mistake, he acted quickly to remedy the situation." [Filing No. 48 at 23.]

Mr. Whitlow argues that "Sgt. Eaton placed [him] on a COVID-19 positive range . . . to provoke misconduct on [his] part." [Filing No. 62 at 4.]

In reply, Defendants argue that Mr. Whitelow "has not offered any factual evidence to dispute Defendants' facts that [Mr. Whitelow] was mistakenly placed in a [COVID-19] range" and "has not shown that he participated in any protected activity [prior to his placement] which would support a claim of retaliation under the First Amendment." [Filing No. 64 at 10-11.]

Under the First Amendment, correctional staff members "may not retaliate against an inmate because he filed grievances." *Manuel v. Nalley*, 966 F.3d 678, 680 (7th Cir. 2020) (citing *Antoine v. Ramos*, 497 F. App'x 631, 634 (7th Cir. 2021)); *Perez v. Fenoglio*, 792 F.3d 768, 783 (7th Cir. 2015) ("[F]iling a non-frivolous grievance is a constitutionally protected activity sufficient to support a retaliation claim."). For an inmate to prevail on a First Amendment retaliation claim, he must "show that the speech or activity was constitutionally protected, a deprivation occurred to deter the protected speech or activity, and the speech or activity was at least a motivating factor in the decision to take retaliatory action." *Manuel*, 966 F.3d at 680 (citing

*Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012)); *Jones v. Van Lanen*, 27 F.4th 1280, 1284 (7th Cir. 2022). "The 'motivating factor' amounts to a causal link between the activity and the unlawful retaliation." *Manuel*, 966 F.3d at 680 (citing *Kidwell*, 679 F.3d at 965). If the inmate can establish a prima facie case of retaliation, the burden shifts to the defendant to show that the same action would have been taken in the absence of the inmate's protected activity. *Manuel*, 966 F.3d at 680 (citation omitted). "Once established, the petitioner must demonstrate the proffered reason is pretextual or dishonest." *Id.*

Mr. Whitelow fails to establish a prima facie case of retaliation. *See Manuel*, 966 F.3d at 680. He has not shown that he engaged in any speech or activity—let alone constitutionally protected conduct—prior to his arrival at Wabash Valley and subsequent placement in the COVID-19 range. Nor has he provided any evidence that such protected activity was a motivating factor for his placement. *See id.* Instead, he merely claims that he was placed in the COVID-19 range to provoke misconduct. [Filing No. 62 at 4.] But this bare assertion is not enough. No reasonable juror could conclude that Mr. Whitelow engaged in protected speech or that it played any role in his placement.

The Court **GRANTS** Defendants' Motion for Summary Judgment on Mr. Whitelow's claim that Sgt. Eaton violated his First Amendment rights upon his arrival to Wabash Valley on May 4, 2020.

  b. <u>Sgt. Eaton May 5 Conduct Report</u>

Defendants argue that Mr. Whitelow cannot show a prima facie case of retaliation on this claim. [Filing No. 48 at 22.] As to the Sgt. Eaton May 5 Conduct Report, Defendants argue that the "grievance [on Sgt. Eaton] was not received by the facility until May 20, 2020, well after the alleged act[] of retaliation," and therefore that Mr. Whitelow "cannot show that he participated in

a protected activity to which Sgt. Eaton would take an adverse action." [Filing No. 48 at 22.] They also argue that Sgt. Eaton wrote the Conduct Report because of Mr. Whitelow's "actions, lack of cooperation, and refusal to comply with order to not cover his camera and to submit to restraints so that his camera could be uncovered." [Filing No. 48 at 23.] Consequently, Defendants assert that even if he can show that he participated in a protected activity prior to the Sgt. Eaton May 5 Conduct Report, Mr. Whitelow cannot show that the protected activity was the cause of the Conduct Report. [Filing No. 48 at 23.]

Mr. Whitelow asserts that on the night of May 5, 2020, he was filling out a grievance against Sgt. Eaton when Sgt. Eaton came to his cell. [Filing No. 62 at 17.] Mr. Whitelow argues that he told Sgt. Eaton that he would only talk to Sgt. Eaton after he finished writing his grievance against Sgt. Eaton and that Sgt. Eaton thereafter "became angry and, without a word, [Mr. Whitelow] was maced." [Filing No. 62 at 17.] He asserts that Sgt. Eaton later "acted in retaliation by making false reports of conduct violations, falsely stating [Mr. Whitelow] refused orders." [Filing No. 62 at 17.]

In reply, Defendants reiterate that the irrefutable video evidence establishes that on the evening of May 5, 2020, Mr. Whitelow continuously covered his camera and cell window despite receiving orders not to and that Mr. Whitelow would have received the Sgt. Eaton May 5 Conduct Report by Sgt. Eaton regardless of any protected activity and therefore cannot show causation. [Filing No. 64 at 11.]

The Court is unpersuaded by Defendants' argument that Mr. Whitelow cannot show he engaged in protected speech simply because the facility did not receive his grievance against Sgt. Eaton until May 20, 2020. Mr. Whitelow has presented evidence that he informed Sgt. Eaton he was filing a grievance against him, and shortly thereafter, Sgt. Eaton issued the May 5, 2020

Conduct Report.  [Filing No. 63 at 7.]  "Grieving about prison conditions is protected First Amendment activity . . . ." *Antoine*, 497 F. App'x at 634 (citing *Gomez v. Randle*, 680 F.3d 859, 866 (7th Cir. 2012)).  Given the facts of this case, the Court finds it irrelevant that the grievance had not yet been formally submitted—there is evidence that Sgt. Eaton was on notice that Mr. Whitelow was going to submit a grievance (Mr. Whitelow told Sgt. Eaton he was going to do so), and just moments later, Mr. Whitelow was placed on Strip Cell status, stripped of all property, and prevented from completing his grievance until much later.

However, Mr. Whitelow's claim ultimately fails because he cannot establish the remaining elements of a prima facie case.  *Manuel*, 966 F.3d at 680.  The critical flaw in his claim is that no reasonable juror could infer that his grievance against Sgt. Eaton was a motivating factor behind the Sgt. Eaton May 5 Conduct Report.  The report—to which Mr. Whitelow pleaded guilty—was based on his refusal to comply with direct orders to submit to mechanical hand restraints so that officers could enter his cell and remove the covering he placed on the camera since he failed to do so himself and is supported by video evidence.  [Filing No. 47-2 at 2; Filing No. 47-2 at 5; Filing No. 47-15 at 07:50-09:12; Filing No. 47-16 at 46:25-46:40.]  This evidence severs any causal link between his protected speech and the alleged retaliatory act.  But even if the connection were plausible, Defendants have met their burden of proving that the Conduct Report would have been issued regardless of Mr. Whitelow's grievance.  *Manuel*, 966 F.3d at 680.  Finally, Mr. Whitelow does not argue—and the Court finds no basis to conclude—that the Sgt. Eaton May 5 Conduct Report was "pretextual or dishonest." *Id.*

The Court **GRANTS** Defendants' Motion for Summary Judgment on Mr. Whitelow's claim that Sgt. Eaton violated his First Amendment rights in connection with the issuance of the Sgt. Eaton May 5 Conduct Report.

2.    *Officer Martin*

Defendants argue that Mr. Whitelow cannot establish a prima facie case of retaliation against Officer Martin because "he cannot show that he participated in a protected activity, and that his participation in the protected activity was the cause" of the Officer Martin May 5 Conduct Report and the Officer Martin May 6 Conduct Report.  [Filing No. 48 at 23.]  They argue further that even if Mr. Whitelow can show a prima facie case against Officer Martin, he cannot "show that the actions of [Officer] Martin would not have occurred regardless" because the Conduct Reports that she wrote were for Mr. Whitelow's behavior of "repeatedly covering his camera within his cell, possessing weapons which were found during a body search, and for using his feces to cover the window and camera in his cell," which is all irrefutably established on video.  [Filing No. 48 at 24.]

Mr. Whitelow argues that after he showed Officer Martin his hand injury and asked her to email medical staff and internal affairs staff, she told Mr. Whitelow that he could cover the camera to use the restroom but then wrote him up for doing so.  [Filing No. 62 at 16.]

In reply, Defendants reiterate their arguments and argue that Mr. Whitelow clearly exceeded Officer Martin's permission to cover his camera because the video evidence shows that it was "excessive and continuous."  [Filing No. 64 at 12.]

The Court finds that Mr. Whitelow has presented enough evidence for a reasonable juror to conclude that his requests for medical attention and internal affairs constituted protected activity. *See Antoine*, 497 F. App'x at 634 ("Grieving about prison conditions is protected First Amendment activity . . . .") (citing *Gomez*, 680 F.3d at 866).  However, his claim ultimately fails because he cannot establish the remaining elements of a prima facie case.  *See Manuel*, 966 F.3d at 680.  As with his previous retaliation claim, the fatal flaw is that no reasonable juror could infer that his

requests for medical attention or internal affairs were a motivating factor in the Officer Martin May 5 Conduct Report or the Officer Martin May 6 Conduct Report. The reports—again, to which Mr. Whitelow pleaded guilty—were based on his repeated obstruction of his cell's camera and window, his use of feces to cover his cell's camera and window, the weapons found on his body (facts irrefutably confirmed by video evidence), and his refusal to comply with orders. [Filing No. 47-2 at 3; Filing No. 47-2 at 4-5; Filing No. 47-4 at 7-10; Filing No. 47-18 at 06:00-1:15:23.] This overwhelming evidence severs any causal connection between his protected speech and Officer Martin's Conduct Reports. Even if such a connection were plausible, Defendants have met their burden of proving that the Officer Martin May 5 Conduct Report and the Officer Martin May 6 Conduct Report would have been issued regardless of Mr. Whitelow's requests for medical attention, internal affairs, or any other protected activity. *See Manuel*, 966 F.3d at 680. Finally, Mr. Whitelow does not argue—and the Court finds no evidence to suggest—that Officer Martin's Conduct Reports were "pretextual or dishonest." *Id.* His retaliation claim, therefore, cannot survive.

The Court **GRANTS** Defendants' Motion for Summary Judgment on Mr. Whitelow's claim that Officer Martin violated his First Amendment rights in connection with the issuance of the Officer Martin May 5 Conduct Report and the Officer Martin May 6 Conduct Report.

### 3. *Officer Wellington and DHO Wadhwan*

Defendants concede that Mr. Whitelow engaged in a protected activity by filing the grievance against Sgt. Eaton and that he was subjected to an adverse action by receiving the Officer Wellington Conduct Report for his grievance. [Filing No. 48 at 24.] Defendants argue, however, that Mr. Whitelow "cannot show that his participation in the protected activity was the cause of the adverse action" and that they are therefore entitled to summary judgment on Mr. Whitelow's

claim.  [Filing No. 48 at 25.]  They assert that after receiving Mr. Whitelow's grievance against Sgt. Eaton alleging that his hand was slammed in the cuff port and that he was sprayed with OC Spray and not provided a decontamination shower, Officer Wellington conducted an investigation and reviewed video footage.  [Filing No. 48 at 25.]  They contend that Officer Wellington also had Major Russell investigate as well, and that both Officer Wellington and Major Russell determined that the allegations in Mr. Whitelow's grievance were false, and that video evidence clearly showed that he was given a decontamination shower after the OC Spray was deployed.  [Filing No. 48 at 25.]  They argue that "Officer Wellington properly submitted a conduct report against [Mr. Whitelow] for his own actions of submitting a frivolous claim" and that DHO Wadhwan found him guilty based on the evidence showing he submitted a frivolous claim.  [Filing No. 48 at 25-26.]

Mr. Whitelow argues that Officer Wellington retaliated against him for filing his grievance against Sgt. Eaton by issuing the Conduct Report alleging that the grievance was false.  [Filing No. 62 at 18.]  He contends that Defendants Wellington and Wadhwan "all acted to protect Sgt. Eaton by . . . by writing false reports, and wrongfully denying [his] grievance."  [Filing No. 62 at 18.]

Defendants reiterate their arguments in reply.  [Filing No. 64 at 12-13.]

Mr. Whitelow claims that his grievance against Sgt. Eaton was denied in retaliation for filing it and that Officer Wellington issued and found him guilty of the Officer Wellington Conduct Report in retaliation for that same grievance.  However, his claim is fundamentally flawed.  Mr. Whitelow ignores the fact that his grievance against Sgt. Eaton was based on a demonstrably false allegation—that he was not provided a decontamination shower after being sprayed with OC spray. [Filing No. 47-15 at 23:13-23:24; Filing No. 47-17 at 06:25-17:31 (video evidence conclusively

establishing that, moments after being sprayed with OC Spray on May 5, 2020, Mr. Whitelow was escorted to and received a decontamination shower).]  Given this irrefutable evidence, no reasonable juror could conclude that the denial of Mr. Whitelow's grievance or the issuance and finding of guilt in the Officer Wellington Conduct Report were acts of retaliation.  Instead, the only reasonable inference is that these actions were based on the false nature of his grievance— not on the fact that he filed it.  As such, he cannot establish a prima facie case of retaliation, and his claim fails as a matter of law.  *Manuel*, 966 F.3d at 680; *Phillips v. Wexford Health Sources Inc.*, 2012 WL 12894734, at *3 (S.D. Ill. Aug. 24, 2012) (rejecting a retaliation claim based on the denial of a grievance when the allegations in the grievance were found to be unsubstantiated, reasoning that "[t]o argue that Defendant denied the grievance in retaliation for Plaintiff filing the grievance is too circuitous, even if, in denying the grievance, Defendant lied.").

The Court **GRANTS** Defendants' Motion for Summary Judgment on Mr. Whitelow's claims that Officer Wellington and DHO Wadhwan violated his First Amendment rights by denying a grievance based on a frivolous claim and issuing a finding of guilt on the subsequent Officer Wellington Conduct Report.

### 4.    *Major Russell*

Defendants argue that Mr. Whitelow's claims that Major Russell retaliated against him when he ordered that his medical brace be removed and when he placed Mr. Whitelow on the Strip Cell Sack Meals fail as a matter of law because Mr. Whitelow cannot show a prima facie case. [Filing No. 48 at 26-27.]  They assert that Mr. Whitelow alleges that the "motivating factor behind the adverse actions" was not due to participation in a protected activity, but rather due to Mr. Whitelow calling Major Russell the "grand wizard."  [Filing No. 48 at 26 (citing Filing No. 47-1 at 99-100).]  They also argue that Mr. Whitelow "cannot show that the adverse action would not

have occurred regardless" because both actions took place immediately after the search of Mr. Whitelow's body and medical brace which uncovered a small metal piece hidden in the medical brace. [Filing No. 48 at 26.]

Mr. Whitelow does not address Defendants' arguments or otherwise respond regarding his retaliation claims against Major Russell. [*See* Filing No. 62.] He merely reiterates the fact that Major Russell directed that the medical brace and his clothing be cut off. [Filing No. 62 at 19.]

Defendants reiterate their arguments in reply, highlighting that Mr. Whitelow "does not create any dispute of fact or offer any other factual or evidential support that he participated in a protected activity which would have caused Major Russell to retaliate." [Filing No. 64 at 14.]

Mr. Whitelow's failure to respond in support of his claims of retaliation against Major Russell is fatal. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver."). Yet even setting that aside, Defendants' arguments regarding a prima face case are well-founded. Calling Major Russell a "grand wizard" is not the equivalent of grieving prison conditions, and therefore, does not constitute protected activity under the First Amendment. *Antoine*, 497 F. App'x at 634 ("Grieving about prison conditions is protected First Amendment activity . . . .") (citing *Gomez*, 680 F.3d at 866); *Whitfield v. Spiller*, 76 F.4th 698, 708 (7th Cir. 2023) (an inmate's speech is not protected if it is disruptive or confrontational; for example, "back talk" is not protected speech). Furthermore, there is no evidence in the record to suggest that either the removal of Mr. Whitelow's medical brace or his placement on Strip Cell Sack Meals was motivated by retaliation for any protected activity. Instead, the undisputed facts show that these actions were taken in direct response to the discovery of a concealed metal item in his medical brace and his prior assault on staff on May 28, 2020.

The Court **GRANTS** Defendants' Motion for Summary Judgment on Mr. Whitelow's claim that Major Russell violated his First Amendment rights in connection with the removal of his medical brace after a search revealed a concealed metal item and the placement on Strip Cell Sack Meals.

### D.    Fourteenth Amendment Equal Protection Claim

Defendants argue that they are entitled to summary judgment on Mr. Whitelow's equal protection claim alleging that Sgt. Chambers "lured [Mr. Whitelow] to his cell door so that he would be sprayed with OC [Spray] and then called him a racial slur on May 29, 2020." [Filing No. 48 at 31.] They assert that "the reason that [Mr. Whitelow] was met with OC Spray on May 29, 2020, had nothing to do with [Mr. Whitelow's] race or any racial prejudice" and was instead because Mr. Whitelow was in possession of a water bottle despite his Strip Cell status and the events of the prior day where Mr. Whitelow used a water bottle to spray his bodily waste on officers. [Filing No. 48 at 31.] They contend that Mr. Whitelow "cannot show that Sgt. Chambers intentionally treated him differently because of his race." [Filing No. 48 at 32 (citation and footnote omitted).]

Mr. Whitelow argues that "without any need for provocation," he was maced on May 29, 2020 and that "Sgt. Chambers stated, 'stew on that for a while n*****.'" [Filing No. 62 at 20 (citation omitted).]

In reply, Defendants assert that Mr. Whitelow "does not address this claim to dispute any of Defendants' facts aside from again alleging that Sgt. Chambers called [him] a racial slur." [Filing No. 64 at 16 (citing Filing No. 62 at 19-20).] They argue that although Sgt. Chambers disputes using a racial slur, "even in the light most favorable to [Mr. Whitelow], [he] cannot

establish a Fourteenth Amendment claim for equal protection as he cannot show that he was treated differently based on his race." [Filing No. 64 at 16.]

"Prisoners are protected under the Equal Protection Clause of the Fourteenth Amendment from invidious discrimination based on race." *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974) (citation omitted); *Lisle v. Welborn*, 933 F.3d 705, 719 (7th Cir. 2019) ("Protection from disparate treatment based upon race does not vanish merely because a person is incarcerated.") (citing *Wolff*, 418 U.S. at 555). To avoid summary judgment on an equal protection claim, a prisoner must "come forward with evidence that would allow a reasonable jury to infer that the defendants intentionally treated him differently because of his race." *Lisle*, 933 F.3d at 719. In *Lisle*, the Seventh Circuit confirmed that the standard set forth in *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016) (an employment decision) applies "to a claim of intentional and unconstitutional race discrimination by prison officials." *Lisle*, 933 F.3d at 720. "[T]he standard is whether all the evidence 'would permit a reasonable factfinder to conclude that plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action.'" *Id.* (quoting *Ortiz*, 834 F.3d at 765).

Here, Mr. Whitelow has not presented sufficient evidence that would allow a jury to reasonably infer that Sgt. Chambers acted based on racial animus when OC Spray was deployed in Mr. Whitelow's cell on May 29, 2020. The Court assumes for the purposes of summary judgment that Sgt. Chambers uttered the horrific racial slur and comment after Sgt. Pirtle deployed OC Spray. But without additional evidence of racial motive, this comment is insufficient to allow a jury to infer racial bias in the use of OC Spray in light of the overall context of events. As explained above, the evidence establishes that Mr. Whitelow had a water bottle and that he placed it in the cuff port, that Mr. Whitelow was ordered multiple times to submit to hand restraints so

that officers could retrieve the water bottle safely, and that he refused to comply.  It is also undisputed that just a day prior, Mr. Whitelow used a different water bottle to carry out an assault on correctional staff members by spraying his bodily waste from it.  While the Court strongly condemns Defendant Chambers' comment, it finds that from this evidence, no reasonable juror could conclude that Sgt. Chambers violated Mr. Whitelow's equal protection rights.  *Lisle*, 933 F.3d at 720; *see, e.g.*, *Jackson v. Runaas*, 2008 WL 5115906, at *4 (W.D. Wis. Dec. 4, 2008) (on a race-based equal protection claim, defendant prison officer's "comment that plaintiff's 'skin is too dark' does not by itself establish a genuine issue of material fact.  Surely this remark is offensive, unprofessional and inappropriate.  But an isolated statement, without more, does not demonstrate discriminatory intent . . . .") (citing *Bahl v. Royal Indem. Co.,* 115 F.3d 1283, 1293 (7th Cir. 1997)).

The Court **GRANTS** Defendants' Motion for Summary Judgment on Mr. Whitelow's claim that his Fourteenth Amendment equal protection rights were violated by Sgt. Chambers on May 29, 2020.

### E.    Eighth Amendment Deliberate Indifference to Medical Care Claim

Mr. Whitelow asserts a claim that he suffered a hand fracture on May 4, 2020 and that he constantly requested medical attention from several Defendants from May 4, 2020 until May 10, 2020 yet was consistently ignored, violating his rights under the Eighth Amendment.

Defendants argue that they are entitled to summary judgment on Mr. Whitelow's claims because the video evidence shows that Mr. Whitelow's hand was not aggressively smashed in the cuff port on May 4, 2020 and that he did not scream for medical attention.  [Filing No. 48 at 27-28 (citations omitted).]  Therefore, Defendants argue that Mr. Whitelow cannot show that he had an objectively, sufficiently serious condition for which the Defendants were deliberately indifferent.  [Filing No. 48 at 28.]

Mr. Whitelow argues that he has "presented ample evidence to create a genuine issue of material fact as to whether Defendants[] were deliberate[ly] indifferent to [his] hand injury from 5/4/2020 until 5/10/2020 when [he] was finally able to submit a [Health Care Request Form]." [Filing No. 62 at 15.]  He argues that he screamed for medical attention after Sgt. Eaton closed his cuff port on May 4, 2020 and that neither "Sgt. Eaton or any other staff summoned medical attention for [his] hand injuries."  [Filing No. 62 at 15.]

In reply, Defendants reiterate their argument and highlight that Mr. Whitelow admitted that he was "escorted to the nurse station" on the night of May 5, 2020 after requesting medical attention for his hand but that the nurses "told the officers to get [him] out of there because [he] was frustrated and loud with Sgt. Eaton."  [Filing No. 62 at 17; Filing No. 64 at 15.]

The Eighth Amendment "requires prisons to provide adequate medical care to prisoners." *Jackson v. Esser*, 105 F.4th 948, 961 (7th Cir. 2024) (citing *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021)).  "Because depriving a prisoner of medical care serves no valid penological purpose, deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Brown v. Osmundson*, 38 F.4th 545, 550 (7th Cir. 2022) (quotations omitted, citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)); *Jackson*, 105 F.4th at 961; *Riley v. Waterman*, 126 F.4th 1287, 1295 (7th Cir. 2025).

"To prevail on a deliberate indifference claim, the plaintiff must prove (1) that he had an objectively serious medical condition (2) to which prison officials were 'deliberately, that is subjectively, indifferent.'"  *Id.* (quoting *Johnson*, 5 F.4th at 824).  The standard is not mere negligence—it requires proof that the defendant knew of and disregarded an excessive risk of inmate health or safety or that they were aware of facts suggesting a substantial risk and consciously ignored it. *Jackson*, 105 F.4th at 961 (quotations and citations omitted).  *Id.*; *Stewart*

49

*v. Wexford Health Sources, Inc.*, 14 F.4th 757, 763 (7th Cir. 2021) ("[D]eliberate indifference requires more than negligence or even gross negligence.") (quotations omitted). "Even 'objective recklessness—failing to act in the face of an unjustifiably high risk that is so obvious that it should be known—is insufficient to make out a claim.'" *Jackson*, 105 F.4th at 961 (quoting *White v. Woods*, 48 F.4th 853, 862 (7th Cir. 2022)).

### 1.    *Objectively Serious Medical Condition*

As explained above, no reasonable juror could find that Sgt. Eaton caused Mr. Whitelow's hand fracture when closing the cuff port on May 4, 2020, as the video evidence conclusively contradicts that claim. However, it is undisputed that Mr. Whitelow sustained a fractured fifth metacarpal in his left hand early in his incarceration at Wabash Valley. Instead of addressing his medical condition, Defendants argue that because Sgt. Eaton did not cause the injury, it was not an objectively serious medical need to which they could be deliberately indifferent. This argument fundamentally misinterprets the law and misconstrues Mr. Whitelow's argument. The cause of an injury is irrelevant to whether it constitutes an objectively serious medical need. Mr. Whitelow's fracture is well-documented through medical records and his own testimony. Defendants cite no authority—and the Court has found none—suggesting that an injury must be caused by an officer for it to qualify as a serious medical need under the Eighth Amendment. That contention is baseless. The Court finds that the first element of the claim—an objectively serious medical condition—is met and that Defendants are not entitled to summary judgment on this ground. The Court proceeds to analyze whether the subjective deliberate indifference element is met.

### 2.    *Subjective Deliberate Indifference*

To establish deliberate indifference, a plaintiff must show that the defendant "*actually* knew of and disregarded a substantial risk of harm." *Petties*, 836 F.3d at 728 (emphasis in original)

(citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).  "Officials can avoid liability by proving they were unaware even of an obvious risk to inmate health or safety."  *Petties*, 836 F.3d at 728 (citing *Farmer*, 511 U.S. at 844).  An "inexplicable delay in treatment which serves no penological interest" can support an inference of deliberate indifference.  *Petties*, 836 F.3d at 730 (noting that "delays are common in the prison setting with limited resources, and whether the length of a delay is tolerable depends on the seriousness of the condition and the ease of providing treatment.").

Neither party proffers much of an argument under this element.  [*See* Filing No. 48 at 27-28; Filing No. 62 at 14-20; Filing No. 64 at 14-15.]  The Court's review of the record and case law, however, establishes that Defendants may well be entitled to summary judgment under this element, as explained below.  Federal Rule of Civil Procedure 56(f)(2) allows a court to grant summary judgment "on grounds not raised by a party" as long as the parties are provided notice and a reasonable time to respond to the Court's intention to do so.  This is the parties' notice.

The Court sets forth below how it sees the record and applicable caselaw on this element, and **ORDERS** Mr. Whitelow to **FILE A RESPONSE** no longer than **5 pages** by **March 12, 2025**, responding only to the Court's discussion below on the ground that it appears that Defendants are entitled to summary judgment based on the subjective deliberate indifference element of his claim.  The failure to respond will result in the Court granting Defendants' Motion for Summary on this claim for the reasons explored below.  *See Olser Institute, Inc. v. Forde*, 333 F.3d 832, 837 (7th Cir. 2003) (holding that plaintiff's "squandered opportunity [to defend its claims was] not grounds for reversal").  The Court **WILL ORDER** further argument from Defendants **IF IT DEEMS NECESSARY AFTER** Mr. Whitelow's response.

It appears that, even construing the record liberally, Mr. Whitelow has not created a triable issue of fact regarding deliberate indifference.  First, it seems that there is a lack of evidence

establishing that any Defendant was aware of the extent of Mr. Whitelow's injury and pain, whenever it occurred.  In other words, the undisputed video evidence does not support an inference that Sgt. Eaton or any other Defendant knew that Mr. Whitelow had sustained a fracture upon his arrival at Wabash Valley on May 4, 2020.

Second, it appears that a complete examination of the record undermines Mr. Whitelow's claim.  To start, the evidence confirms that on May 5, 2020, after requesting medical attention, Mr. Whitelow was escorted to the nurse's station.  [Filing No. 63 at 17 (Mr. Whitelow's affidavit attesting to this fact).]  Upon arrival, the evidence shows that he was "frustrated and loud with Sgt. Eaton" and the nurse "told the officers to get [him] out of there" and did not medically assess him. [Filing No. 63 at 17 (Mr. Whitelow's affidavit).]  While delaying or denying medical care can amount to deliberate indifference, *Estelle*, 429 U.S. at 104-05; *Petties*, 836 F.3d at 730, in this instance, it seems that the refusal to assess Mr. Whitelow was due to his disruptive behavior—not a deliberate denial of care.  It looks, therefore, that the response served a legitimate penological purpose, maintaining order and discipline among inmates, and did not violate the Eighth Amendment.

It appears further that the undisputed evidence continues to establish facts that contradict Mr. Whitelow's claim that his requests for medical attention were ignored until May 10, 2020.  On May 10, 2022, Mr. Whitelow submitted a Health Care Request Form, stating: "My hand was smashed in the door by C.O.[s] and appears to be broken. . . Male nurse on [T]hursday said [I] was put in for x-ray but [N]urse Perez said I was not put in[.]  Can [I] please be seen before damage is permanent."  [Filing No. 57 at 2.]  Crucially here, May 10, 2020 was a Sunday.  The "Thursday" referenced in his request was therefore May 7, 2020—meaning that Mr. Whitelow himself acknowledges that he was seen by a nurse just two days after May 5, 2020 when he requested

medical attention, which directly contradicts his claim that Defendants ignored his requests from May 5, 2020 until May 10, 2020.

While two days is not a short amount of time for someone in pain, it appears, on the facts of this case, that that no reasonable juror could infer that the delay was "an inexplicable delay . . . which serve[d] no penological interest" such that it amounted to deliberate indifference.  *Petties, 836 F.3d at 730* (citations omitted); *cf. Grieveson v. Anderson, 538 F.3d 763, 767-68, 779-80 (7th Cir. 2008)* (where there were no issues with prisoner's behavior or other reason to delay care, prison officers' delay of securing prisoner medical treatment for one-and-a-half days created a triable issue of fact as to the officers' states of mind).  From May 5 into the early hours on May 6, 2020, the undisputed evidence shows that Mr. Whitelow repeatedly covered his camera and cell window, including with feces; refused to comply with orders; and was found with two weapons—a GTL tablet battery pack tied into a sheet and a sharpened metal object on his person.  [Filing No. 47-4 at 3; Filing No. 47-18 at 31:18-31:25.]  While Mr. Whitelow's hand fracture was a serious injury, and an x-ray is a rather simple diagnostic treatment tool, it looks as if the ability to provide such treatment to Mr. Whitelow while he was indisputably hostile and found with weapons was nonexistent.  In other words, it appears that the delay was not a result of deliberate indifference but rather a necessary measure to preserve the penological interests of maintaining institutional security and discipline.  *Bell v. Wolfish, 441 U.S. 520, 546-47 (1979)* ("[M]aintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners . . . . '[C]entral to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves.'") (quoting *Pell v. Procunier, 417 U.S. 817, 823 (1974)*, other citations omitted).

Based on the parties' minimal discussion of second element of Mr. Whitelow's claim of Eighth Amendment deliberate indifference to medical care, Federal Rule 56(f)(2), and the Court's research and review of the record, the Court **TAKES UNDER ADVISEMENT** Defendants' Motion for Summary Judgment on this claim. Pursuant to Rule 56(f)(2), the Court **ORDERS** Mr. Whitelow to **FILE A RESPONSE** no longer than **5 pages** by **March 12, 2025**, responding only to the Court's discussion above that it appears that Defendants are entitled to summary judgment based on the subjective deliberate indifference element of his claim. The failure to file a response will result in the Court granting Defendants' Motion for Summary on this claim. The Court **WILL ORDER** further argument from Defendants **IF IT DEEMS NECESSARY AFTER** Mr. Whitelow's response.

## IV.
### CONCLUSION

For the foregoing reasons, the Court:

- **GRANTS** Defendants' Motion for Summary Judgment, [46], as to the following claims:

  - Eighth Amendment excessive force claims against Sgt. Eaton, Officer Troup, Sgt. Chambers, Sgt. Pirtle, Sgt. Cobb, and Lt. Small;

  - Eighth Amendment conditions of confinement claim relating to the Strip Cell Sack Meals against Major Russell;

  - First Amendment retaliation claims against Sgt. Eaton, Officer Martin, Officer Wellington, DHO Wadhwan, and Major Russell; and

  - Fourteenth Amendment race-based equal protection claim Sgt. Chambers; and

- **TAKES UNDER ADVISEMENT** Mr. Whitelow's Eighth Amendment deliberate indifference to medical care against Sgt. Eaton, Major Russell, Casework Manager Gonthier, Officer Martin, Sgt. Sgt. Cobb, Sgt. Drada, Lt. Small, and Lt. Allen, and

- o pursuant to Rule 56(f)(2), **ORDERS** Mr. Whitelow to **FILE A RESPONSE** no longer than 5 pages **by March 12, 2025**, responding only to the Court's discussion above that it appears that Defendants are entitled to summary judgment based on the subjective deliberate indifference element of his claim.

- o The failure to file a response will result in the Court granting Defendants' Motion for Summary on this claim.

- o The Court **WILL ORDER** further argument from Defendants **IF IT DEEMS NECESSARY AFTER** Mr. Whitelow's response.

No partial judgment shall enter.

Date: 2/26/2025

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**

**Distribution via United States Mail to**:

JB Whitelow, Jr.
217729
WABASH VALLEY - CF
WABASH VALLEY CORRECTIONAL FACILITY - Inmate Mail/Parcels
6908 S. Old US Hwy 41
P.O. Box 1111
CARLISLE, IN 47838